[Civ. No. 49135. First Dist., Div. Two. Oct. 6, 1980.]

In re the Marriage of BARBARA DIANE and
JOHNNY PARIS HOPSON.
BARBARA DIANE HOPSON, Appellant, v.
JOHNNY PARIS HOPSON, Respondent.

888

**COUNSEL**

William M. Hilton for Appellant.

James W. Blackman for Respondent.

OPINION

**TAYLOR, P. J.**—Barbara Diane Hopson (mother) appeals from a memorandum decision granting the motion of Johnny Paris Hopson (father) to dismiss for lack of jurisdiction her action to enforce an Arizona custody decree pursuant to Civil Code section 5164.[1] For the reasons set forth below, we have concluded that the subsequent Tennessee modification awarding custody to the father is not entitled to full faith and credit as the Tennessee court did not have jurisdiction. The best interests of the children require that we reverse and remand for a full hearing on the custody issue.

The pertinent facts as set forth by the record are as follows: In November 1976, the Arizona court issued a decree dissolving the marriage of the parties and awarding custody of the two minor children, Douglas (born 1966) and Brent (born 1971) to the mother, with rights of reasonable visitation in the father. Prior to dissolution, the parties had resided in Arizona for approximately two years, while the father was stationed in the Navy.

In December 1976, the Arizona court amended the decree to prohibit either party from removing the children from Arizona without the written permission of the other party or the court. As in the previous order, the court found that both parties were fit to have custody but that it would be in the best interest of the children to award custody to the mother; the modified order continued the father's visitation rights, which included 60 days in the summer from June 1 to July 30. A month later, the father returned to Tennessee, his childhood home, where he has resided ever since.

In February 1977, the mother left Arizona with the children and moved to California without obtaining either the consent of the father or an order of the Arizona court. In June 1977, she took the children to Hawaii for approximately two months during the period of the father's visitation. Shortly after returning from Hawaii, the mother went to Arizona with the children to assist in the sale of the parties' home and returned to California toward the end of August.

---

[1] The statute is part of the Uniform Child Custody Jurisdiction Act (UCCJA). Arizona, like California, has adopted the uniform act; Tennessee has not.

In September 1977, in Arizona, the father moved for a modification of custody; his motion was noticed for January 1978.[2] In October 1977, while the Arizona change of custody proceeding was pending, the father came to California and removed the children to Tennessee without the knowledge or consent of the mother. The father claimed that he did so at the request and urging of Douglas, a matter hotly disputed by the mother. Within four days after his return, he commenced a proceeding in Tennessee to obtain custody; the mother was served in the Tennessee action. Subsequently, California charged the father with violation of Penal Code section 278 (felony child stealing).

In January 1978, the Arizona court heard the motion for modification of custody award, with the mother present, and the father apparently absent, but represented by counsel. On February 16, 1978, the Arizona court granted the mother's motion to remove the children to California "or such other place as the mother desires to reside," and denied the father's motion for custody. At the time this order was filed (and continuously since October 1977 up to and including the present time), the children have been living in Tennessee with the father.

In February 1978 (in the same month as the Arizona order) the Tennessee court denied the mother's motion to dismiss for lack of jurisdiction; she then made a general appearance in the Tennessee action. The matter was continued to March 14, 1979. At the hearing, the mother testified, as did the two children. The Tennessee court found that the children had been taken to Tennessee at their request. Although the Tennessee court was aware of the prior Arizona decree, the father's conduct and the criminal proceedings pending in California, it found that it was in the best interests of the children to award custody to the father. As to the February 1978 Arizona order permitting the mother to take the children to California, the Tennessee court stated that no such order had been admitted into evidence, but indicated that even if such an order did exist, it would not alter its finding that the children's best interests were served by awarding custody to the father. The Tennessee judgment was entered on March 22, 1979, and is now final.

On May 1, 1979, pursuant to Civil Code section 5164, the mother sought to enforce the amended Arizona decree, which awarded her custody and the February 16, 1978, order authorizing her to remove the

[2]Although no records to this effect were admitted in evidence, the court below relied on the mother's uncontested affidavit.

children to California. She also filed an order to show cause and declaration re contempt (marriage) to compel the father's compliance with the Arizona order and to return the children to her.

On May 10, 1979, the father filed the Tennessee custody decree in California and moved to dismiss the mother's action on grounds of lack of jurisdiction. On May 15, 1979, the matter was heard and taken under submission. On July 25, 1979, the trial court granted the father's motion to dismiss for lack of jurisdiction and accorded full faith and credit to the Tennessee judgment. This appeal ensued.

 We turn first to the father's contentions that the mother's general appearance conferred jurisdiction of the custody issue on the Tennessee court and thereby renders that court's ruling res judicata, and not subject to collateral attack. We do not agree. The res judicata effect of a custody decree is contingent upon the court having jurisdiction. "Collateral attack is proper to contest lack of personal or subject matter jurisdiction..." (*Armstrong* v. *Armstrong* (1976) 15 Cal.3d 942, 950 [126 Cal.Rptr. 805, 544 P.2d 941]).

 The exclusive method of determining subject matter jurisdiction in custody cases in California is the Uniform Child Custody Jurisdiction Act (Civ. Code, §§ 5150-5174;[3] UCCJA).[4] As Division One of this court established in *Smith* v. *Superior Court* (1977) 68 Cal.App.3d 457, 461-462 [137 Cal.Rptr. 348], the provisions of the UCCJA supersede any contrary decisional and statutory laws (accord: *In re Marriage of Ben-Yehoshua* (1979) 91 Cal.App.3d 259, 264 [154 Cal.Rptr. 80]; *In re Marriage of Steiner* (1979) 89 Cal.App.3d 363 [152 Cal.Rptr. 612]; *Neal* v. *Superior Court* (1978) 84 Cal.App.3d 847, 858 [148 Cal.Rptr. 841]). The father's reliance on *Mattos* v. *Correia* (1969) 274 Cal.App.2d 413 [79 Cal.Rptr. 229], which predates the UCCJA, is inapposite.

Section 5152 sets forth specifically the bases upon which jurisdiction over the custody issue may be exercised. There is no provision in the act for jurisdiction to be established by reason of the presence of the parties

---

[3]All further references are to these provisions of the Civil Code except as otherwise noted.

[4]In 1973, this state adopted the UCCJA virtually intact; the minor modifications made in the California version do not bear directly upon the issues presented.

or by stipulation or consent.[5] The section expressly provides that the mere physical presence or the absence of the minor is neither a prerequisite to, nor is it determinative of, the custody issue (§ 5152, subds. (2), (3)).

Subdivision (1) sets forth the criteria here applicable so far as pertinent as follows: "(1) A court of this state which is competent to decide child custody matters has jurisdiction to make a child custody determination by initial or modification decree if the conditions as set forth in any of the following paragraphs are met:

"(a) This state (i) is the home state of the child at the time of commencement of the proceeding, or (ii) had been the child's home state within six months before commencement of the proceeding and the child is absent from this state because of his removal or retention by a person claiming his custody or for other reasons, and a parent or person acting as parent continues to live in this state.

"(b) It is in the best interest of the child that a court of this state assume jurisdiction because (i) the child and his parents, or the child and at least one contestant, have a significant connection with this state, and (ii) there is available in this state substantial evidence concerning the child's present or future care, protection, training, and personal relationships."

In construing this portion of the statute, the court in *In re Marriage of Ben-Yehoshua, supra*, 91 Cal.App.3d, at pages 263-264, concluded that personal jurisdiction over the parties did not give a California court subject matter jurisdiction of the custody issue.

In *In re Marriage of Schwander* (1978) 79 Cal.App.3d 1013 [145 Cal.Rptr. 325], the court was faced with a similar question of enforcing a custody decree of a sister state (Illinois), which, like Tennessee here, had not adopted the UCCJA. Interpreting section 5162, the court stated at page 1018: "This statute declares, as a matter of state law, that custody decrees of sister states will be recognized and enforced. Recognition and enforcement are mandatory if the state in which the decree

---

[5]This has long been the rule in this state as to custody. Justice Traynor held in *Sampsell* v. *Superior Court* (1948) 32 Cal.2d 763, 773-776 [197 P.2d 739], that subject matter jurisdiction cannot be conferred upon a court by consent, waiver or estoppel.

was rendered (1) has adopted the Act, (2) has statutory jurisdictional requirements substantially like those of the Act, or (3) would have had jurisdiction under the facts of the case if the Act had been the law in the state. (9 U. Laws Ann. 120, Comrs.' Note foll. § 13 of the Act.)"[6]

The record here indicates that the court below determined only that California failed to meet the jurisdictional requirements of section 5152 as to subdivision (1)(a), as at the commencement of this action, the children had been away from California for the preceding 19 months; and that as to subdivision (1)(b), they had no significant connection to this state, as they had lived here only eight months (two of which were spent in Hawaii), and had since been in Tennessee. Although the court below was aware that the children had been taken to Tennessee, in violation of the Arizona decree, it made no inquiry or determination as to the propriety of Tennessee's exercise of jurisdiction under standards substantially in accordance with the UCCJA.

The filing of the Tennessee decree with this state does not in and of itself mandate enforcement. Under section 5162, as indicated above, the lower court must first determine if the order was made "substantially in accordance" with the standards of the UCCJA before it can be enforced under section 5164.[7] Logic compels the necessity for such an inquiry in light of the incongruous situation here presented where both parties seek enforcement of conflicting custody orders, after registering them with the court. It is precisely such a conflict that the UCCJA seeks to remedy.

■ Therefore, the thrust of our present inquiry is directed to answering the question: Did Tennessee have jurisdiction to modify the Arizona decree? We make this determination by examining the language of the statute, the intent of the Legislature, as expressed in the

---

[6] In Schwander, the court concluded that California was required to enforce the Illinois decree as it was made under standards that parallel those of the UCCJA.

[7] Section 5164 sets forth the procedures for and effect of registering a decree from another state: "(1) A certified copy of a custody decree of another state may be filed in the office of the clerk of any superior court of this state. The clerk shall treat the decree in the same manner as a custody decree of the superior court of this state. *A custody decree so filed has the same effect and shall be enforced in like manner as a custody decree rendered by a court of this state.*

"(2) A person violating a custody decree of another state which makes it necessary to enforce the decree in this state may be required to pay necessary travel and other expenses, including attorneys' fees, incurred by the party entitled to the custody or his witnesses." (Italics added.)

commissioner's notes[8] and the salient facts at hand (see *Smith v. Superior Court, supra,* 68 Cal.App.3d at p. 464).

As indicated above, only the first two alternative bases of jurisdiction of section 5152, are pertinent here. Under the first or home state test[9] of section 5152, subdivision (1)(a), a court has jurisdiction to make a child custody determination by initial or modification decree if the state "(i) is the home state of the child at the time of commencement of the proceeding...." Applying these principles to the instant case, we can only conclude that at the time of the commencement of the Tennessee proceeding, Tennessee failed to meet jurisdictional requirements sufficient to satisfy the home state test of section 5152, subdivision (1)(a).

The uncontroverted evidence indicates that in October 1977, when the father commenced the custody action in Tennessee, the children had been living in California with their mother for the preceding eight months. Under the UCCJA, the time the children spent in Hawaii and Arizona during the summer of 1977 were mere temporary absences, not affecting the six-month residency requirement. Thus, the home state of the children at the time the father commenced the Tennessee proceeding was California. Tennessee was not the home state of the children, as the Arizona court had awarded custody of the children to the mother.

The alternative test of section 5152, subdivision (1)(b) presents greater difficulty. Jurisdiction requires a finding of strong contact of a child and at least one parent with the state *and* the existence of substantial evidence concerning the child's care and relationships with others. As the court noted in *Neal v. Superior Court, supra*, 84 Cal.App.3d at page 849, the requirements of significant connection and substantial evidence "are in the conjunctive. Conformity with both is indispensable to jurisdiction." Under this provision, the significant date is the date of the hearing rather than the commencement of the action (*In re Marriage of Steiner, supra*, 89 Cal.App.3d, at p. 369). As by the time of

---

[8] "'Reports of commissions which have proposed statutes that are subsequently adopted are entitled to substantial weight in construing the statutes...'" (*Keeler v. Superior Court*, 2 Cal.3d 619, 630 [87 Cal.Rptr. 481, 470 P.2d 617, 40 A.L.R.3d 420]).

[9] "'Home state' is defined as 'the state in which the child immediately preceding the time involved *lived with his parents* [or] a parent...for at least *six consecutive months*....Periods of temporary absence of any of the named persons are counted as part of the six-month or other period.' (C.C. 5151(5).)" (6 Witkin, Summary of Cal. Law (8th ed. 1974) p. 4560.)

the hearing in March 1979[10] the father was domiciled in Tennessee and the boys had been living there for 17 months, the Tennessee court could find that the children and their father had a significant connection with Tennessee and that substantial evidence concerning the children's care, performance in school, and relationships with others existed in Tennessee. However, Tennessee would also have to show that its assumption of jurisdiction was in the best interest of the children.

In commenting on the application of subdivision (1)(b), the commissioners expressed that "perhaps more than any other provision of the Act requires that it be interpreted in the spirit of the legislative purposes expressed" in section 5150 (quoted below at fn. 14 on p. 896.) "The paragraph was phrased in general terms in order to be flexible enough to cover many fact situations too diverse to lend themselves to exact description. But its purpose is to limit jurisdiction rather than to proliferate it. The first clause of the paragraph is important: jurisdiction exists only if it is in the *child's* interest, not merely the interest or convenience of the feuding parties, to determine custody in a particular state. The interest of the child is served when the forum has optimum access to relevant evidence about the child and family. There must be maximum rather than minimum contact with the state" (9 U. Laws Ann. Commrs.' Note foll. § 3, italics included). Thus here, a technical application of the test could be held to confer jurisdiction on Tennessee at the time of the hearing. However, the manner by which the children were taken to Tennessee to fulfill the requirements of section 5152, subdivision (1)(b) directly conflicts with the spirit of the legislation.[11] The record is devoid of any evidence on the basis of which the Tennessee court decided to reopen the question of custody which had been awarded to the mother by the Arizona court.

There is little dispute that the paramount concern underlying the act, as in all custody disputes, is the welfare of the child. Professor Brigitte M. Bodenheimer[12] confronted the anomaly. Recognizing that the cardi-

---

[10]The record does not explain the reasons for the long delay between the commencement of the Tennessee action in October 1977, and the hearing in March 1979.

[11]Section 5150, subdivision (1)(e) establishes that a key purpose of the act is to "[d]eter abductions and other unilateral removals of children undertaken to obtain custody awards."

[12]Professor Bodenheimer was a reporter for the special committee which drafted the act (see Bodenheimer, *The Uniform Child Custody Jurisdiction Act: A Legislative Remedy for Children Caught in the Conflict of Laws* (1969) 22 Vand. L.Rev. 1207;

nal rule of custody law is that the court must be governed above all by a concern for the best interests or welfare of the child, she noted the harmful effects on children that were unwittingly promulgated by the expansive and independent interpretations given by courts all too willing to reopen custody hearings. Therefore, a compelling force behind the act is the recognized need to give a measure of finality to custody decrees in order to insure a more stable environment for the "interstate child"[13] (Bodenheimer, *A Legislative Remedy, supra,* 22 Vand. L.Rev. 1207, 1209-1210).

Analyzing the dilemma created by the application of section 5152, subdivision (1)(b) under the circumstances we note that on the one hand we are told that the best interest of the child is served if jurisdiction is exercised by the forum with which he has maximum contact and in which there is substantial evidence concerning his relationship with others. As of the time of the hearing, Tennessee satisfied both of these requirements.

On the other hand, we must construe section 5152, subdivision (1)(b) reasonably in the spirit of the legislative objectives, as set forth in section 5150, quoted below.[14] It is well settled that "the court of the forum should ordinarily refuse to reopen the question of the custody of a child whose custody is vested under an existing decree in a nonresident parent" (*Ferreira* v. *Ferreira* (1973) 9 Cal.3d 824, 829 [109 Cal.Rptr. 80, 512 P.2d 304]). Even though *Ferreira* predates California's adoption of UCCJA, the distinct similarity of concern and policy between the two has insured the continuing validity of *Ferreira* (*In re Marriage of Kern* (1978) 87 Cal.App.3d 402, 408 [150 Cal.Rptr. 860]). The *Ferreira* principle is still the general rule in California (*Allison* v. *Superior Court* (1979) 99 Cal.App.3d 993, 1002 [160 Cal.Rptr. 309]).

also Bodenheimer, *Progress Under the Uniform Child Custody Jurisdiction Act and Remaining Problems Punitive Decrees, Joint Custody and Excessive Modifications* (1977) 65 Cal. L.Rev. 978).

[13]See Ehrenzweig, *The Interstate Child and Uniform Legislation: A Plea for Extra-litigious Proceedings,* (1965) 64 Mich. L. Rev. 1.

[14]Section 5150 provides: "(1) The general purposes of this title are to:

"(a) Avoid jurisdiction competition and conflict with courts of other states in matters of child custody which have in the past resulted in the shifting of children from state to state with harmful effects on their well-being.

"(b) Promote cooperation with the courts of other states to the end that a custody decree is rendered in that state which can best decide the case in the interest of the child.

"(c) Assure that litigation concerning the custody of a child take place ordinarily in the state with which the child and his family have the closest connection and where sig-

The expressed intent of the UCCJA to deter abductions has been confirmed by the courts: "Section 5152 *cannot reasonably be construed as meaning that the act of a parent,* bringing a child to [Tennessee] *in violation of a foreign custody order, thereby establishes 'a significant connection' of the child with [that] state for the purpose of making a new custody order*" (*Neal* v. *Superior Court, supra,* 84 Cal.App.3d, at p. 850; italics added). In the long run, refusal to condone abduction provides better stability for children who would otherwise remain subject to the exercise of lawless self-help by their embattled parents.

Significantly, the UCCJA incorporated the "clean hands doctrine" into section 5157. "Under this doctrine *courts refuse to assume jurisdiction to reexamine an out-of-state custody decree when the petitioner has abducted the child* or has engaged in some other objectionable scheme to gain or retain physical custody of the child in violation of the decree" (9 U. Laws Ann. Commrs.' Note foll. § 8; italics added). The commissioners' note, quoted above, makes it clear that when the petitioner for modification has wrongfully removed the children from another state which had jurisdiction, the provisions of both the jurisdictional statute (§ 5152) and this statute (§ 5157) must be met before the court of the state to which the children have been removed may exercise its jurisdiction (cf. *Marriage of Settle* (1976) 276 Ore. 759 [556 P.2d 962, 967]).[15]

Subdivision (2) of section 5157 is expressly applicable to the instant case, as it states: "(2) *Unless required in the interest of the child, the*

nificant evidence concerning his care, protection, training, and personal relationships is most readily available, and that courts of this state decline the exercise of jurisdiction when the child and his family have a closer connection with another state.

"(d) Discourage continuing controversies over child custody in the interest of greater stability of home environment and of secure family relationships for the child.

"(e) Deter abductions and other unilateral removals of children undertaken to obtain custody awards.

"(f) Avoid relitigation of custody decisions of other states in this state insofar as feasible.

"(g) Facilitate the enforcement of custody decrees of other states.

"(h) Promote and expand the exchange of information and other forms of mutual assistance between the courts of this state and those of other states concerned with the same child.

"(i) To make uniform the law of those states which enact it.

"(2) This title shall be construed to promote the general purposes stated in this section."

[15]Oregon has adopted the UCCJA.

*court shall not exercise its jurisdiction to modify a custody decree of another state if the petitioner, without consent of the person entitled to custody has improperly removed the child from the physical custody of the person entitled to custody* or has improperly retained the child after a visit or other temporary relinquishment of physical custody. If the petitioner has violated any other provision of a custody decree of another state the court may decline to exercise its jurisdiction if this is just and proper under the circumstances" (italics added).

The above provision of section 5157, subdivision (2) clearly distinguishes illegal removal or retention from all other custody violations. As to the former, refusal of jurisdiction is mandatory; as to the latter, refusal of jurisdiction is merely discretionary (see 9 U. Laws Ann., Commrs.' Note, foll. § 8).[16]

Thus, even if Tennessee had jurisdiction (pursuant to § 5152, subd. (1)(b)) to modify the Arizona decree, section 5157 required the Tennessee court to refuse jurisdiction *unless* it found that the harm done to the children by denying jurisdiction outweighed the abduction of the children in violation of the Arizona order (see Commrs.' Note, Foll. § 8). In *Reed* v. *High* (1978) 254 Pa.Super.Ct. [385 A.2d 1384], the Pennsylvania court[17] noted that the meaning of "'[u]nless required' remains to be developed by the cases; *'required' is, however, a strong word, and would seem to impose a very heavy burden of proof on the kidnapper parent*" (at pp. 1385-1386, fn. 1; italics added). The record does not indicate that the children had been abandoned or abused by the mother. The Tennessee court acknowledged her fitness as a parent to have custody of the children. Thus, it clearly appears that the father has not met the burden to show justification for his acts within the meaning of section 5157.

In addition, we cannot ignore the paradox created by the father's initiation of proceedings in two different states (Arizona and Tennessee) within a month of each other. The UCCJA specifically sought to deter the unlawful removal and detention of children in hopes of finding a court that would issue a decision in his favor. Here, where the father first petitioned the Arizona court to modify the custody award, and shortly thereafter illegally removed the children from California, and

---

[16]We also note that the record indicates that the Tennessee court apparently equated the conduct of both parents. This conflicts with section 5157, subdivision (2).

[17]Pennsylvania has adopted the UCCJA.

commenced a similar action in Tennessee, he demonstrated a flagrant disrespect for the lawful processes of our judicial system.

Despite its awareness of the father's wrongful act, the Tennessee court accorded great weight to its findings that the abduction was instigated and encouraged by one of the children and that the father believed that he was acting in the children's best interest. Justification for kidnaping based on a child's requests or a parent's belief that he was acting in the child's best interest, is nowhere found in the UCCJA. To the contrary, the act focuses primarily upon the evils of childnaping and does not distinguish between voluntary and involuntary abductions. The fact that Tennessee not only opened its doors to him, but also granted his motion, despite his overt actions in flouting the law, compels us to apply the clean hands doctrine of section 5157 in denying recognition of the Tennessee judgment. Giving recognition to the Tennessee decree condones the father's behavior and encourages unlawful abductions; it invites parental manipulation and deceit, while undermining the basic parent-child relationship. It could also encourage a balky child, armed with this information, to seek refuge with the noncustodial parent when confronted with a particular rule or discipline of the custodial parent which the child dislikes.

We conclude that given the clear purpose and policy of the UCCJA to deter childnaping, the Tennessee court failed to comport with jurisdictional standards substantially in accordance with the UCCJA.

■ Further, since the UCCJA seeks to limit jurisdiction rather than encourage or condone its proliferation, certain procedures must be followed before a court may exercise jurisdiction. Thus, even assuming Tennessee properly determined that it had jurisdiction pursuant to section 5152, subdivision (1)(b), the procedures prescribed by UCCJA did not permit the exercise of that jurisdiction here.

The commissioners realistically anticipated the problem of concurrent jurisdiction existing in more than one state. Therefore, they provided additional steps to assure that only one state makes the custody decision. The fact that one state has jurisdiction over a custody dispute under Civil Code section 5152, subdivision (1)(b) does not preclude another state from jurisdiction (*Schlumpf* v. *Superior Court* (1978) 79 Cal.App.3d 892, 898 [145 Cal.Rptr. 190]). The first step in the UCCJA's orderly procedure for determining which court may exercise jurisdiction requires that the court must ascertain whether it has juris-

diction under the terms of the UCCJA; second, the court must determine whether there is a custody proceeding pending or a decree existing in another state which presently has jurisdiction. If the court finds that it has jurisdiction, and that there is no proceeding pending or a decree existing, then it must determine which state is the most convenient forum to exercise jurisdiction. If it finds another state is a more convenient forum, then under the standards of the UCCJA, *it may not exercise jurisdiction* (*Carson* v. *Carson* (1977) 29 Ore.App. 769 [565 P.2d 763]; affd. (1978) 282 Ore. 469 [579 P.2d 846]).[18] Examination of the instant record indicates that these procedures were not followed by Tennessee.

Section 5155, subdivision (1)[19] requires a court to refrain from exercising jurisdiction if, at the time of filing, a custody proceeding was pending in another state. In the instant case, the father initiated the Tennessee action just one month after the Arizona action. Thus, Tennessee should have stayed or dismissed its proceeding in order to find substantial compliance with this subdivision. By denying the mother's challenge to its jurisdiction and proceeding independently, Tennessee acted in direct contravention to the procedural standards of the UCCJA.

Under section 5155, subdivision (3)[20] the Tennessee court was mandated to stay its proceeding and communicate with the Arizona court once Tennessee had notice of the mother's petition for permission to remove the children to California. Although the subsequent Arizona order was not in evidence, under the principles of the UCCJA, it was error for the Tennessee court to proceed to final judgment without first following the required procedure. From the record, it appears that Tennessee made no effort to communicate with, or obtain, any records from Arizona.

---

[18]As indicated above, at footnote 15, Oregon has adopted the UCCJA.

[19]Section 5155, subdivision (1) provides: "A court of this state shall not exercise its jurisdiction under this title if at the time of filing the petition a proceeding concerning the custody of the child was pending in a court of another state exercising jurisdiction substantially in conformity with this title, unless the proceeding is stayed by the court of the other state because this state is a more appropriate forum or for other reasons."

[20]Section 5155, subdivision (3) states: "If the court is informed during the course of the proceeding that a proceeding concerning the custody of the child was pending in another state before the court assumed jurisdiction it shall stay the proceeding and communicate with the court in which the other proceeding is pending to the end that the issue may be litigated in the more appropriate forum and that information be exchanged in accordance with Sections 5168 through 5171. If a court of this state has

The record also indicates that Tennessee made no determination that it was the more appropriate forum to hear the matter of custody than either Arizona or California. Once the Tennessee court became aware of the Arizona order, it was required to give it priority pursuant to section 5156, set forth, so far as pertinent below.[21] Among the factors to be considered is whether Tennessee's exercise of jurisdiction would contravene any of the purposes stated in section 5150. Since the first purpose expressed under section 5150, subdivision (1) is to avoid jurisdictional competition and conflict with courts of other states resulting in the interstate shifting about of children to their detriment, we note that just such effect was created by Tennessee's decision to open its doors to the father. If instead had Tennessee denied the father access to its courts, the additional stress and costs of multiple litigation could have been substantially reduced, if not wholly avoided, including the necessity for the instant action. The court in *Palm* v. *Superior Court* (1979) 97 Cal. App.3d 456, 468 [158 Cal.Rptr. 786], recently clarified the policy underlying section 5156 by stating that its purpose is "to provide the court with a tool to allow another court to go forward, not to create a confrontation or deny another court the authority to proceed."

---

made a custody decree before being informed of a pending proceeding in a court of another state it shall immediately inform that court of the fact. If the court is informed that a proceeding was commenced in another state after it assumed jurisdiction it shall likewise inform the other court to the end that the issues may be litigated in the more appropriate forum."

[21]"(1) A court which has jurisdiction under this title to make an initial or modification decree may decline to exercise its jurisdiction any time before making a decree if it finds that it is an inconvenient forum to make a custody determination under the circumstances of the case and that a court of another state is a more appropriate forum.

"(3) In determining if it is an inconvenient forum, the court shall consider if *it is in the interest of the child that another state assume jurisdiction.* For this purpose it may take into account the following factors, among others:

"(a) If another state is or recently was the child's home state.

"(b) If another state has a closer connection with the child and his family or with the child and one or more of the contestants.

"(c) If substantial evidence concerning the child's present or future care, protection, training, and personal relationships is more readily available in another state.

"(d) If the parties have agreed on another forum which is no less appropriate.

"(e) *If the exercise of jurisdiction by a court of this state would contravene any of the purposes stated in Section 5150.*

"(4) Before determining whether to decline or retain jurisdiction the court may communicate with a court of another state and exchange information pertinent to the assumption of jurisdiction by either court with a view to assuring that jurisdiction will be exercised by the more appropriate court and that a forum will be available to the parties" (italics added).

The fact that Tennessee did not follow procedures that conform substantially with those of the statute is understandable in light of the fact that Tennessee has not adopted the UCCJA. Nevertheless, we are compelled to apply the principles of UCCJA in determining the validity of the Tennessee order, i.e., the propriety of its exercise of jurisdiction. Substantial evidence indicating a total absence of procedural safeguards in conformity with those established by the UCCJA further supports our conclusion that the Tennessee judgment was not entitled to full faith and credit.[22]

■ We turn next to the mother's contention that this state has jurisdiction to enforce the Arizona decree. Pursuant to section 5162,[23] recognition and enforcement of a custody decree of a sister state that has adopted the act is mandatory unless it has subsequently been modified under jurisdictional standards corresponding to those of the act. Arizona has adopted the UCCJA. As we have concluded that the Tennessee modification was made under standards that are legally infirm as measured by the UCCJA, this state is required to recognize and enforce the Arizona decree awarding custody to the mother. Accordingly, the court below abused its discretion in finding that California lacked jurisdiction to hear the contempt charge in the present action. California's jurisdiction to hear the contempt proceeding arises from its enactment of the UCCJA. "The fact that the custody judgment is not a final one is no obstacle to recognition. It can be recognized and enforced until modified."[24]

Pursuant to section 5164,[25] California was required to enforce the Arizona decree as of the moment of its filing. Therefore, as of May 1, 1979, the Arizona decree became, in effect, a custody decree enforceable in California. Unless and until such decree is modified, under jurisdictional standards that are substantially in accordance with the

---

[22]We are aware that the Tennessee court expressed its interest in the welfare of the children. The compassion shown for the children, as well as the plight of the parents, indicates the Tennessee court's concern in reaching a decision which it believed to be in the children's best interest. However, this does not disturb our finding that the Tennessee court's modification of the Arizona child custody decree is unquestionably at odds with the letter and spirit of the UCCJA.

[23]Section 5162, quoted above, at page 893.

[24]Bodenheimer: *A Legislative Remedy, supra,* 22 Vand. L. Rev. 1207, 1235.

[25]Section 5164, *supra.*

UCCJA, we are mandated to give full force and effect to the Arizona decree. The fact that Arizona may no longer have the power to modify the decree neither invalidates its effort nor emasculates its validity.

While this state has jurisdiction to hear the contempt proceeding to enforce the Arizona decree, that proceeding would not permit a determination of the custody issue. "Contempt proceedings or other proceedings that might arise in the enforcing state do not open up the custody decree to petitions for modifications. If modification is desired, [section 5163][26]requires that the petition be directed to the court which has jurisdiction to modify."[27]

█ Because there has been a substantial change in circumstances since the issuance of the Arizona decree, it is apparent that the best interests of the children require that a full hearing be held on the matter of child custody and that a California court is the appropriate forum to exercise jurisdiction. Our conclusion is supported by the following:

Arizona no longer has jurisdiction to modify its decree since it no longer meets the jurisdictional requirements of section 5152. Although the UCCJA presumes the continuing jurisdiction of the court that rendered the initial order, the ties between the parties and the children with Arizona have become tenuous with the passage of time. Neither party has lived in Arizona for the past three and one-half years, nor does any evidence indicate an intent to return and reside there in the future. Thus, neither the home state test nor the significant connection and substantial evidence test of section 5152 is now met by Arizona.

An examination of the factors to be considered pursuant to section 5156 (quoted above at fn. 21) in determining the more appropriate forum reveals that while the home state and substantial factors could support Tennessee's exercise of jurisdiction, we accord a greater weight

---

[26]Section 5163 provides: "(1) If a court of another state has made a custody decree, a court of this state shall not modify that decree unless (a) it appears to the court of this state that the court which rendered the decree does not now have jurisdiction under jurisdictional prerequisites substantially in accordance with this title or has declined to assume jurisdiction to modify the decree and (b) the court of this state has jurisdiction.

"(2) If a court of this state is authorized under subdivision (1) and Section 5157 to modify a custody decree of another state it shall give due consideration to the transcript of the record and other documents of all previous proceedings submitted to it in accordance with Section 5171."

[27]Bodenheimer, *supra*, *A Legislative Remedy*, 22 Vand. L. Rev. at page 1236. 1236.

to the fifth factor (subd. (3)(e)) of not contravening the purposes of the UCCJA. As we have explained, the exercise of jurisdiction by Tennessee subverts the purposes of the UCCJA and also does not meet its jurisdictional or procedural requirements. We reiterate that to permit Tennessee to exercise jurisdiction at this time would essentially encourage kidnaping and discourage the lawful custodian from seeking the aid of the courts by orderly judicial process.

The purpose of the six-month requirement of the home state test was to provide the individual who is deprived of legal custody by the unlawful acts of the other party with an opportunity to sue in her own state rather than be forced to chase the abductor to a foreign state in order to reclaim the child.[28] While it is unfortunate that the mother did not seek enforcement earlier in California, she should not be penalized for not utilizing an advantageous procedure offered to her. In fact, because of the proceeding pending in Arizona when the father abducted the children, California probably would have been required to dismiss or stay the proceedings in favor of Arizona's continuing jurisdiction, since the greater and more significant bulk of evidence concerning the care and relationships of the children existed in Arizona at that time.

As we have indicated, at the time of the commencement of the Tennessee proceeding, California was the home state of the children. At the time the children's absence was brought about by the unilateral act of the father in violation of a valid custody order, California had jurisdiction to determine custody under the home state test of section 5152, subdivision (1)(a). The alternative test of section 5152, subdivision (1)(b) also resulted in a similar vesting of jurisdiction in California. The children and their mother had a "significant connection" with California since they had been living here since February 1977, and a state is presumed to have an interest in its domicilaries. In addition, substantial evidence concerning the children's care, school performance and personal relationships would presumably have been readily available in California had they continued to reside with the mother under the existing decree. Under the circumstances, it would appear that the best interests of the children would have justified California's assumption of jurisdiction at that time. The strong policy behind the act to deter abductions supports our conclusion that under the principles expressed, jurisdiction to modify the Arizona decree did not exist in Tennessee.

---

[28]Bodenheimer, *A Legislative Remedy, supra,* 22 Vand. L. Rev. 1207, 1225-1226.

"The Act does not support an interpretation which would encourage the very evils the Commissioners on Uniform State Laws intended to eradicate."[29]

The application of the principles and procedures of the UCCJA leads us to the conclusion that under the law of this state, California is presently the appropriate court to exercise jurisdiction in the instant case and to conduct a full hearing on the issue of child custody.[30] Here, where the original court no longer has sufficient contact with the children to assume jurisdiction, where another court modified the initial decree under standards which conflict with the UCCJA, and where the children were illegally removed from the jurisdiction which otherwise would have been the appropriate court to exercise jurisdiction under the statute, the circumstances have changed materially and warrant reopening the question of custody. It clearly appears that the best interest of the children will be served by the California court making a custody determination after a full and complete hearing on the facts.

We recognize that enforcing the Arizona decree will require the temporary shifting about of the children, of which the UCCJA specifically disapproves. However, under the present circumstances, where the uprooting of the children was caused initially by the unlawful act of the father in abducting them and retaining them illegally in Tennessee for the past three years, justice requires that the children be returned to the lawful custodian absent a showing of harm to the children. As the court observed in the interstate custody case of *Nehra* v. *Uhlar* (1977) 43 N.Y.2d 242 [401 N.Y.S.2d 168, 171, 372 N.E.2d 4]: "That a change in custody may prove temporarily disruptive to the children is not determinative, for all changes in custody are disruptive."[31]

This case, like most child custody matters, involves a collision of principles as well as of intransigent would-be custodians of the hapless

---

[29]Bodenheimer, *Progress Under the Uniform Child Custody Jurisdiction Act, supra,* 65 Cal. L. Rev. 978, 988.

[30]Section 5171 provides: "If a custody decree has been rendered in another state concerning a child involved in a custody proceeding pending in a court of this state, the court of this state upon taking jurisdiction of the case shall request of the court of the other state a certified copy of the transcript of any court record and other documents mentioned in Section 5170."

[31]Although *Nehra* was decided after New York had adopted the UCCJA but prior to its effective date, the court did not hesitate to apply its recognized principles. "[I]f the best interests of all children are to be served, the abduction of children to avoid the effect of custody decrees must be deterred" (p. 172).

children, innocent subjects of a conflict they can never understand. The primary principle of the child's best interest is never easily applied once the litigants themselves have succeeded in creating the disruption of shifting custody as has happened in this case. The courts can only repair, patch and cover over, as best they can, the irreparable harm occasioned and reduce the harm to a minimum, if the minimum is discernible.

Priority, not as an absolute but as a weighty factor, should, in the absence of extraordinary circumstances, be accorded to the first custody awarded in litigation or by voluntary agreement. Similarly qualified priority should also be accorded to the judgment of the court of greatest concern with the welfare of the children. Denigrated in rank should be the consequences of child-snatching, flight from the courts of jurisdiction, and defiance of legal process and judgments. Also denigrated in rank, to some degree, should be the natural or manipulated "satisfaction" of young abducted children with the homes where they presently abide.

Applying these principles and considering the best interest of the children, presently the mother is entitled to custody because the Arizona court so decreed, because she is a fit parent, because the father obtained the possession of the children by lawless self-help, because of the transitory harm caused by the father, and because there is insufficient showing that the harm to the children if they are returned to the mother is any more irreparable than that caused by the father in creating the situation in the first instance. The courts cannot assure the happiness and stability of these children; that only their parents could have done and, hopefully, can still do.

The UCCJA places an affirmative duty upon the court involved in a custody proceeding to delve deeply into all the records, documents and information that pertain to the issue of custody of the children. Here, the courts of California, Arizona and Tennessee must act in partnership to produce all pertinent material. Only by creating a complete and cohesive picture can a court reasonably determine what is in the best interest of the children.

Furthermore, the court should require the presence of the children at the hearing pursuant to section 5160, subdivision (2)[32] and section

[32]Section 5160, subdivision (2) provides: "If a party to the proceeding whose presence is desired by the court is outside this state with or without the child the court may order that the notice given under Section 5154 include a statement directing that party

4600.[33] As explained by the commissioners: "Since a custody proceeding is concerned with the past and future care of the child by one of the parties, it is of vital importance in most cases that the judge has an opportunity to see and hear the contestants and the child" (9 U. Laws Ann., Commrs.' Note foll. § 11).

We approve of the concern and sensitivity that the Tennessee court accorded the children in hearing their testimony, as indicated by the record. Of course, the court is not bound to decide according to their preference and may award custody consistent with its finding of the best interest of the children (see *In re Marriage of Mehlmauer* (1976) 60 Cal.App.3d 104 [131 Cal.Rptr. 325]; 6 Witkin, Summary of Cal. Law (1980 Supp.) § 69, p. 136; 2 Markey, Cal. Family Law, § 22.80).

In addition, we caution the court not to be swayed in its decision on custody by the affront to its dignity occasioned by the actions of the parents. The act does not condone punitive measures as a basis for awarding custody.[34]

We reverse the order dismissing the mother's action to enforce the Arizona decree and contempt, and direct the court to proceed with a hearing on the issue of custody.

Miller, J., and Smith, J., concurred.

---

to appear personally with or without the child and declaring that failure to appear may result in a decision adverse to that party."

[33]Section 4600 provides, so far as pertinent, that "If a child is of sufficient age and capacity to reason so as to form an intelligent preference as to custody, the court shall consider and give due weight to the wishes of the child in making an award of custody or modification thereof."

[34]"Punitive decrees are disfavored because they disrupt the stability and continuity of the child's environment" (Bodenheimer, *Progress Under the Uniform Child Custody Jurisdiction Act, supra,* 65 Cal. L. Rev. 978, 1004).