Filed 12/8/15  In re Angelo G. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re ANGELO G. et al., Persons Coming Under the Juvenile Court Law. | D067759 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. EJ3515) |
| v. | |
| MARIA M. et al., | |
| Defendants and Appellants. | |

APPEALS from orders of the Superior Court of San Diego County, Carol Isackson, Judge.  Vacated and remanded with directions.

Rosemary Bishop, under appointment by the Court of Appeal, for Defendant and Appellant Maria M.

Jamie A. Moran, under appointment by the Court of Appeal, for Defendant and Appellant F.G.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Paula J. Roach, Deputy County Counsel, for Plaintiff and Respondent.

F.G. appeals an order of the juvenile court terminating parental rights to his sons Angelo G. and Emilio G. (collectively, the twins), under Welfare and Institutions Code section 366.26 and placing the twins for adoption. F.G. contends the juvenile court did not comply with the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA; Family Code section 3400 et seq.), lacked sufficient evidence of adoptability, and erred in finding the sibling and beneficial parent relationship exceptions did not apply.[1] Maria M., the twins' mother, also challenges adoptability and joins in F.G.'s arguments to the extent they inure to her benefit.

We need not address the contentions regarding adoptability and exceptions thereto because we find the court did not comply with the UCCJEA. We therefore vacate the findings and orders and remand to the juvenile court to conduct a further hearing regarding subject matter jurisdiction under the UCCJEA.

---

[1]     Statutory references are to the Family Code unless otherwise noted.

2

FACTUAL AND PROCEDURAL BACKGROUND[2]

The twins were born in May 2008. At the time, F.G. and Maria were in a long-term relationship, lived together, and had two other children, one of whom (Adrian G.) lived with them.[3] F.G. and Maria have never married.

The San Diego County Health and Human Services Agency (Agency) opened the twins' dependency case in February 2012 when they were three years old. The Agency's child abuse hotline had received a report Maria accompanied a friend to the superior court in El Cajon while intoxicated and caring for the twins; she smelled of alcohol, was stumbling and falling down, and was unable to fill out paperwork for the children's waiting room. One boy had bruises on his face. A social worker visited Maria's housing complex the next day and found the twins playing in the middle of the complex without proper supervision. On February 7, 2012, the Agency filed juvenile dependency petitions on the twins' behalf.

According to the detention report, Maria said she "moved to San Diego two months ago from Colorado Springs" and lived in New Mexico prior to Colorado.[4] A social worker sent child welfare history requests to Colorado and New Mexico. F.G. said he, Maria, and the children lived in Colorado "until Oct[ober] 2011, when he was

---

[2] We confine our summary to the facts relevant to and providing context for the UCCJEA issue.

[3] The other children are not at issue in this appeal.

[4] Maria also had filled out a parentage questionnaire, indicating the twins did not live with F.G., but visited "every weekend."

deported to Mexico," "[t]he mother and children later moved to [California]," and he currently was residing in Tijuana, Mexico.  He stated the parents initially alternated weeks with the children, but then said there was no set visitation schedule; the visits lasted "a week at a time," occurred "regularly," and the last visit prior to detention ended on January 30, 2012.  The report also indicated the twins "only spoke in the Spanish language."

At the detention hearing, the court found "[t]he UCCJEA may apply." (Capitalization omitted.)  The court took emergency jurisdiction under the UCCJEA and stated the "order for emergency jurisdiction is to expire on 3/6/12 unless extended by the court."  (Capitalization omitted.)  The court also ordered the twins detained.

The jurisdiction/disposition report again addressed the family's residential history, but reflected different reports from the parents.  Maria and F.G. agreed the family lived in Colorado prior to F.G.'s deportation.[5]  However, according to this report, Maria said she and the children lived with F.G. in Mexico "temporarily" in November 2011, until she could establish a home in the United States, and then moved to Spring Valley, California, in December 2011.  She denied the children ever had a permanent residence with F.G. in Mexico and stated they only visited him.  Maria also denied she had lived in New Mexico.  As for F.G., he indicated he was deported in March 2011 and went to stay with his family in Guadalajara, Mexico.  He said Maria and her father helped bring the twins to stay with him.  He explained the twins lived with him in Guadalajara from March 2011

---

5       The report indicated the family also had lived in Utah for a few months after Adrian's birth.

4

to October 2011, at which point he and the twins moved to Tijuana to be closer to Maria and Adrian. He agreed Maria and Adrian stayed with him in November 2011, but stated the "twins continued to live with him in Mexico" and were only visiting Maria for a dentist appointment when they were taken into protective custody. He maintained the twins had been "solely in his care since March 2011" and wanted them returned to him.

The jurisdiction/disposition report also provided some additional information about the parents and twins. Maria had a second interview at a fast food restaurant and F.G. worked at a restaurant and did carpentry jobs. Maria stated "[s]he and the children would have cookie parties and barbecues with the other families in the neighborhood" and attended church weekly. F.G.'s paternal uncle and aunt lived near Maria and assisted with caring for the children. The report confirmed the twins "primarily [spoke] the Spanish language." The twins were not of school age, but their foster mother was preparing to enroll them in Head Start. The doctor who conducted the twins' well-child exams upon detention recommended follow-up with their primary physician, but it is unclear if they had one or if this was a general recommendation. The twins were not participating in any mental health or behavioral services. The report confirmed the Agency requested child welfare history from Colorado and New Mexico.

On March 6, 2012, the court held a hearing to address the UCCJEA, among other matters, and provided notice to the parties. Maria attended; F.G. did not, but his counsel appeared. The court found "conflicting" evidence as to whether Mexico could be the twins' home state, observing "[t]here's an indication that the mother was visiting the father in Mexico with the children, pending her obtaining a residence in the United

States" but that "[t]here was also some statement in the report that no, they actually lived there."

The court proceeded to examine Maria about Mexico, first asking whether she "live[d] with [F.G.] and the kids" in Mexico. She indicated "[w]e stayed there for one of the summer breaks for three months. Yes, we did have residence, but we've never been -- we lived with his sister in Guadalajara. We visited in Tijuana and in Juarez. So I've never had a home residence . . . ." She denied going "with the children to Mexico with the intention" of residing there or being a citizen. The court asked, "So in a sense, you were just visiting relatives and killing some time until you were able to get a home here. Is that what we're looking at?" Maria responded "I've had a home here. I've lived here all my life. From the transition from Colorado to San Diego, we stayed out there for a couple of months." The court elicited further testimony that Maria had never rented or established a home in Mexico. The court again asked if it was Maria's position she was "just visiting" F.G. in Mexico; she stated "I was, but the twins had stayed there longer with him." It then confirmed Maria had not been involved in court proceedings with the children in Mexico or had custody orders outside of the present case. The court then stated "[b]ased on the mother's -- if anybody wants to be heard on this, I'm prepared to say the UCCJEA does not apply in this case."

County counsel examined Maria briefly about other states and confirmed there were no Colorado custody proceedings. The court found "even if [Colorado] was a home state . . . , because neither of the kids or a parent is located there, that would not qualify as a home state . . . . And . . . even if there [had] been proceedings there, they are now

6

submitting to the jurisdiction of the California [c]ourt." It concluded the UCCJEA did not apply.

At subsequent hearings in March and April 2012, the court found jurisdiction under Welfare and Institutions Code section 300 et seq. and declared the twins dependents. In March 2015, the court ordered F.G.'s and Maria's parental rights terminated and the twins placed for adoption. F.G. and Maria appealed.

## DISCUSSION

### I

### *Background on the UCCJEA*

The UCCJEA is the exclusive method for determining subject matter jurisdiction for child custody proceedings in California. (§§ 3421, subd. (b), 3402, subd. (d); *In re Gino C.* (2014) 224 Cal.App.4th 959, 965 (*Gino C.*).)

Pursuant to the UCCJEA, a state may assume jurisdiction to make an initial child custody determination only if any of the following apply: (1) the state is the child's home state (§ 3421, subd. (a)(1)), (2) the child has no home state or the home state declined to exercise jurisdiction on the ground the state is the more appropriate forum under sections 3427 or 3428, and both (a) the child and at least one parent have significant connections to the state and (b) substantial evidence can be found there (§ 3421, subd. (a)(2)), (3) all states with jurisdiction declined to exercise it on the ground the state is the more appropriate forum under sections 3427 or 3428 (§ 3421, subd. (a)(3)), and (4) no other

state has jurisdiction under the foregoing tests (*Id.*, subd. (a)(4)). A state also may have emergency jurisdiction under certain circumstances. (§ 3424.)[6]

" '[S]ubject matter jurisdiction either exists or does not exist at the time the action is commenced . . . .' " (*In re A.C.* (2005) 130 Cal.App.4th 854, 860 (*A.C.*).) "We are not bound by the juvenile court's findings regarding subject matter jurisdiction, but rather 'independently reweigh the jurisdictional facts.' " (*Ibid.*)

## II

### *Permanent Subject Matter Jurisdiction*

The juvenile court found the UCCJEA did not apply. Given UCCJEA exclusivity, we interpret this to mean the court found California had jurisdiction pursuant to the UCCJEA. (See *Gino C.*, *supra*, 224 Cal.App.4th at p. 965.) For the reasons discussed below, we find the record was insufficient to support California jurisdiction. (See *In re Baby Boy M.* (2006) 141 Cal.App.4th 588, 599 (*Baby Boy M.*) [finding the record did "not contain sufficient facts to establish whether California has subject matter jurisdiction" and the absence of certain evidence "[did] not constitute the affirmative showing required to establish jurisdiction"]; see also *In re Marriage of Hopson* (1980) 110 Cal.App.3d 884, 894 (*Hopson*) [subject matter jurisdiction under predecessor statute,

---

6     We discuss each basis for jurisdiction in more detail, *post*.

Uniform Child Custody Jurisdiction Act (UCCJA), required findings that statutory criteria were met].)[7]

Although this court independently reviews jurisdictional facts, we decline to find there is no subject matter jurisdiction on the current record. Instead, we discuss deficiencies in the record, *post*, and remand to the juvenile court for further proceedings. Remand will allow the court to determine the remaining jurisdictional facts and preserve the due process rights of the parties to present evidence and cross-examine witnesses. (§ 3425; *A.C., supra,* 130 Cal.App.4th at p. 864.)

A

*Home State Jurisdiction*

Home state jurisdiction exists when "[t]his state is the home state of the child on the date of the commencement of the proceeding, or was the home state of the child within six months before the commencement of the proceeding and the child is absent from this state but a parent or person acting as a parent continues to live in this state." (§ 3421, subd. (a)(1).) A child's " '[h]ome state' " is "the state [or country] in which a child lived with a parent or a person acting as a parent for at least six consecutive months immediately before the commencement of a child custody proceeding." (§§ 3402, subd. (g), 3405, subd. (a) ["[a] court of this state shall treat a foreign country as if it were a state

_____

[7]     "Cases interpreting the UCCJA may be instructive in deciding cases under the [UCCJEA], except where the two statutory schemes vary." (*A.C.*, *supra*, 130 Cal.App.4th at p. 860.)

9

of the United States" for the UCCJEA purposes].)  The six-month period includes a "temporary absence of any of the mentioned persons."  (§ 3402, subd. (g).)

The juvenile court made no explicit findings on California or Mexico home state jurisdiction, but presumably found both lacked it.  (See *A.C.*, *supra*, 130 Cal.App.4th at p. 862 ["For California to have subject matter jurisdiction under [§] 3421, [subd.] (a)(2), (3), or (4), Mexico must lack jurisdiction."].)  The relevant date for home state jurisdiction was six months prior to the twins' February 7, 2012, petition date, or August 7, 2011.  There is no question California lacked home state jurisdiction, as the twins moved to California no earlier than December 2011 (if at all; F.G. maintains they continued to live with him through detention).  Mexico, however, could have had home state jurisdiction if the twins lived there from August 7 to February 7, other than temporary absences.  (§ 3421, subd. (a)(1).)  This is F.G.'s position:  that the twins lived with him in Mexico from before August 7 until they were detained on February 7, other than visits to California.  The record reflects insufficient evidence to support the court's apparent rejection of Mexico home state jurisdiction.

As the court recognized at the outset of the March 6 hearing, there was conflicting evidence in the Agency's reports about the twins' time in Mexico.[8]  By the end of the

---

8    The Agency contends a social worker adopted Maria's account in the jurisdiction/disposition report.  The report identifies the competing views, but does not appear to adopt either one, and the same social worker later acknowledged the conflict at the disposition hearing.  The Agency also cites an April 2012 addendum report, in which the social worker recounted Maria's version of the residential history.  Even assuming this reflected adoption of Maria's view, this was not before the court at the relevant time and would not have resolved the conflict in any event.

hearing, the court concluded the UCCJEA did not apply, meaning it viewed the conflict as resolved. However, Maria's testimony did not resolve the conflict and there was no other evidence to do so. Significantly, her testimony did not address a critical issue—the twins' particular whereabouts throughout the relevant time period—instead focusing on her living situation and intentions. Maria's only specific comment about the twins (as opposed to her or the children generally) was that they "stayed there longer" in Mexico after she left. As for her intentions in visiting Mexico and then establishing a residence in California, they are of limited relevance to the factual question of where the twins actually lived. (See *Ocegueda v. Perreira* (2015) 232 Cal.App.4th 1079, 1088-1089.) She also did not address F.G.'s position that the twins lived with him or evidence potentially in support of it, such as the detention report finding the twins spoke only Spanish at the time.[9]

Maria's testimony also reflected inconsistencies. She first testified she and the children stayed in Mexico over a summer for three months, with F.G.'s sister in Guadalajara and in Tijuana and Juarez. She then said they stayed in Mexico during the transition to San Diego "for a couple of months," without specifying the time frame. In the jurisdiction/disposition report, she indicated this transition was in November 2011

---

[9] The Agency suggests on appeal the twins may have spoken Spanish because they were not yet in Head Start, whereas their older brother Adrian had started in the United States and thus spoke English. County counsel could have, but did not, ask Maria about these matters at the March 6 hearing.

11

and only for one month.[10]  It is unclear whether Maria was referring to different stays. Either way, if she and the children were in Mexico over the summer of 2011, this potentially supports F.G.'s position he was deported in March 2011.  In addition, the reference to F.G.'s sister in Guadalajara aligns with F.G.'s account he stayed with his family there upon returning to Mexico.  That said, F.G. did not report Maria staying with him in Mexico before October or November 2011, other than to transport the twins there.

The Agency does not explain how Maria's testimony resolves the conflict in the parents' accounts, instead suggesting we should disregard F.G.'s version.  It contends "[o]n review in this [c]ourt, all conflicts in evidence are resolved to support the court's ruling," relying on *In re Autumn H.* (1994) 27 Cal.App.4th 567, 576.  However, we independently review jurisdictional facts and, as discussed *ante*, do not find sufficient evidence to evaluate F.G.'s account (other than Maria's similarly problematic testimony). (See *A.C.*, *supra*, 130 Cal.App.4th at p. 860.)  As for *In re Autumn H.*, it does not address the UCCJEA, or even subject matter jurisdiction generally, and thus offers no guidance here.  The Agency also suggests F.G.'s request for custody at the disposition hearing as a noncustodial parent means he agreed the twins did not reside with him prior to detention. However, F.G.'s counsel stated at the same hearing the twins had lived with F.G. for up to six months and it appeared the parents were trying to figure out a way to share them. [11]

---

[10]     Maria also had diverged from her initial detention report account suggesting she moved directly from Colorado to California with the children.

[11]     The social worker testified earlier in the hearing that F.G. indicated he had sole care of the twins for approximately six months between March 2011 and October 2011.

The record was deficient even prior to the hearing. The Agency did not request child welfare services history from Mexico, had no records from Mexico, and there is no indication it sought to verify F.G.'s deportation date prior to or at the March 6 hearing.[12]

In light of the inconsistencies both within and between the parents' accounts, the lack of any substantive effort to resolve them, and the absence of relevant jurisdictional facts, we find the record inadequate to support the juvenile court's rejection of Mexico home state jurisdiction.

B

*Significant Connection Jurisdiction*

Even if Mexico had no home state jurisdiction, the juvenile court next was required to consider whether California or Mexico had subject matter jurisdiction under section 3421, subdivision (a)(2). (See *Baby Boy M.*, *supra*, 141 Cal.App.4th at p. 600.) This form of jurisdiction requires that "[a] court of another state does not have [home state] jurisdiction . . . , or a court of the home state of the child has declined to exercise jurisdiction on the grounds that this state is the more appropriate forum . . . , and both of the following are true:  [¶]  (A) The child and the child's parents, or the child and at least one parent or a person acting as a parent, have a significant connection with this state other than mere physical presence.  [¶]  (B) Substantial evidence is available in this state

_____

12      We note the juvenile court stated at the Welfare and Institutions section 366.26 hearing in March 2015 that "the history shows that the father was deported on February 12th."  It is unclear what history the court was referring to or whether it was available at the time the court ruled on UCCJEA jurisdiction.

13

concerning the child's care, protection, training, and personal relationships."  (§ 3421, subd. (a)(2).)

The juvenile court made no findings at to the twins' significant connections or the location of substantial evidence and we again turn to the record.

Courts applying the significant connection prong look to the residence of the custodial parent and child, with some courts also considering other ties to the state.  (See, e.g., *In re Marriage of Sareen* (2007) 153 Cal.App.4th 371, 381 (*Sareen*) [mother's declaration indicating she and the child were settled in California after three months of residence, her "family, work and financial connections to Sacramento," and the absence of contradictory evidence from father supported significant connections]; *In re S.W.* (2007) 148 Cal.App.4th 1501, 1510 (*S.W.*) [mother and children had significant connection to California "because they were residing in this state at the time the proceedings were commenced"]; *In re Marriage of Arnold & Cully* (1990) 222 Cal.App.3d 499, 503 [finding no significant connections under the UCCJA where the only evidence of California connections were the noncustodial parent's residence and short visits by the child].)  The record is inadequate to permit this analysis.  As discussed *ante*, there is insufficient evidence to permit a determination regarding where the twins lived.  Although the social worker's reports contain some information about other connections (such as F.G. having an uncle residing near Maria and Maria's statements regarding community relationships), they do not offer a complete record and these facts were neither considered, nor supplemented, at the March 6 hearing.

14

The substantial evidence prong focuses on the location of evidence regarding the "child's care, protection, training, and personal relationships." (§ 3421, subd. (a)(2)(B).) (See, e.g., *Sareen*, *supra*, 153 Cal.App.4th at p. 381 [finding "undisputed evidence established that the relevant current information relating to [the child], her day[]care, her family relationships, her friends and her activities, as well as the relevant information regarding her future care, protection, and schooling was available in California, where she and [the mother] had settled"]; *S.W.*, *supra*, 148 Cal.App.4th at pp. 1510-1511 [substantial evidence existed in the state, where the paternal grandmother permitted use of her home and provided food and clothing, local child welfare workers observed the family's living conditions, and the children's closest relationship was with the mother, who resided in California].)[13] Here, the social worker's reports contain limited information on relevant evidence available in California, and some was only in connection with detention (e.g., the well-child medical examinations) or not necessarily supportive of California jurisdiction (e.g., the twins speaking only Spanish). (See, e.g., *Plas, supra*, 155 Cal.App.3d at p. 1016, fn. 6 [noting child "speak[ing] English fluently" may "have some bearing" on substantial evidence inquiry].) No evidence was presented at the March 6 hearing on this issue.

F.G. contends the record supports Mexico's significant connection jurisdiction and argues key information, including about his efforts to obtain return of the twins and the

---

[13]    The twins' citizenship also may be relevant. (See *Plas v. Superior Court* (1984) 155 Cal.App.3d 1008, 1016, fn. 6 [child's citizenship "may have some bearing" with respect to substantial evidence]; *Gino C., supra*, 224 Cal.App.4th at p. 963 [noting juvenile court inquired as to children's citizenship at the UCCJEA hearing].)

15

suitability of his home, "comes from Mexico." He explains he lives there, did his services there, and received home approval from the Mexico social services agency. The Agency rejects his argument on the grounds significant connection jurisdiction cannot exist unless a home state has declined jurisdiction and because F.G. cites events from "long after" the court took jurisdiction. We reject the first contention. Significant connection jurisdiction also can exist where there is no home state. (§ 3421, subd. (a)(2).) We do agree significant connection jurisdiction turns on circumstances at the outset of the case and again find insufficient evidence. (See *A.C.*, *supra*, 130 Cal.App.4th at p. 860.)[14] The Agency's reports contain little or no information on significant connections with Mexico or substantial evidence located there, the Agency did not request or obtain records from Mexico at the time, and the court did not address the possibility of Mexico significant connection jurisdiction at the March 6 hearing.

---

14    Courts have disagreed as to whether significant connection jurisdiction is determined as of the petition date or the hearing date. (Compare, e.g., *Haywood v. Superior Court* (2000) 77 Cal.App.4th 949, 955 [finding, as to corresponding UCCJA provision, that "unlike the 'home state' provision," it "does not tie jurisdiction to events occurring before or at the time an action is commenced"]; and *Hopson, supra,* 110 Cal.App.3d at p. 894 [relevant time for significant connection jurisdiction is "the date of the hearing"], with *Plas*, *supra*, 155 Cal.App.3d at p. 1015, fn. 5, 2d par. [finding *Hopson* unpersuasive and concluding significant connection jurisdiction is better decided when the "action is commenced"].) However, here, as in *Plas*, the difference "is of no consequence," as the petition and hearing were only one month apart and "there was no change in circumstances . . . ." (*Plas*, at p. 1015, fn. 5, 3d par.)

## C

### *More Appropriate Forum Jurisdiction*

A state also has jurisdiction if "[a]ll courts having jurisdiction under [§ 3421, subd. (a)(1) and (2)] have declined to exercise [it] on the ground that a court of this state is the more appropriate forum to determine the custody of the child . . . ." (§ 3421, subd. (a)(3).) The record does not reflect any other state declined jurisdiction, and thus does not support jurisdiction on this basis.

## D

### *Vacuum Jurisdiction*

Finally, jurisdiction exists when "[n]o court of any other state would have jurisdiction under the criteria specified in [§ 3421, subd. (a)](1), (2), or (3)." The Agency relies on this provision. However, on the record before us and for the reasons discussed above, we cannot conclude that no state would have jurisdiction over the twins under the other provisions of section 3421.

The Agency's remaining contentions in support of permanent jurisdiction likewise are unpersuasive. It notes F.G.'s counsel "did not request the court question the father," suggesting F.G. had the burden of establishing there was no California jurisdiction. He did not. (*Baby Boy M.*, *supra*, 141 Cal.App.4th at p. 599 ["Implicit in [defendant's] argument is the assertion the Department, which initiated the dependency proceedings, bears the burden of establishing the court's jurisdiction. We agree [citations] . . . ."].) The Agency also implies F.G. either consented to or waived jurisdiction, observing his counsel "did not object to the UCCJEA finding." Neither consent nor waiver can create

17

jurisdiction. (*A.C.*, *supra*, 130 Cal.App.4th at p. 860 [" '[S]ubject matter jurisdiction' . . . cannot be conferred by stipulation, consent, waiver, or estoppel [citations]."].)[15]

## III

### *Emergency Jurisdiction*

Emergency jurisdiction is a separate basis for the UCCJEA jurisdiction. (§ 3424.) Although the Agency does not rely on it, we elect to address it pursuant to our independent review of the jurisdictional facts. (*A.C.*, *supra*, 130 Cal.App.4th at p. 860.)

A court may exercise "temporary emergency jurisdiction" when a "child is present in this state and . . . it is necessary in an emergency to protect the child because the child . . . is subjected to, or threatened with, mistreatment or abuse." (§ 3424, subd. (a); *Gino C.*, *supra*, 224 Cal.App.4th at pp. 965-966.) "The finding of an emergency is to be made only after an evidentiary hearing, although the juvenile court can detain the child before that hearing." (*A.C.*, *supra*, 130 Cal.App.4th at p. 864.) Temporary emergency jurisdiction "does not confer authority to make a permanent child custody determination." (*Gino C.*, at pp. 965-966.) However, where there is no existing child custody proceeding in another state, "a child custody determination made under this section remains in effect until an order is obtained from a court of a state having jurisdiction . . . . If a child custody proceeding has not been or is not commenced in a court of a state having

---

15     F.G. also raises a consent issue, noting the juvenile court's comment about the parties "submitting to the jurisdiction of the California [c]ourt" and suggesting this was a "key factor" for the court in finding jurisdiction. To the extent the court relied on consent to find jurisdiction, this was error. (*A.C.*, *supra*, 130 Cal.App.4th at p. 860.)

jurisdiction . . . , a child custody determination made under this section becomes a final determination, if it so provides and this state becomes the home state of the child." (§ 3424, subd. (b).)

Here, the juvenile court purported to take temporary emergency jurisdiction at the detention hearing. Even if it properly did so, its failure to assess adequately the possibility of Mexico jurisdiction (and, if applicable, provide Mexico an opportunity to act) precluded any temporary jurisdiction from ripening into permanent jurisdiction. (§ 3424, subd. (b); *Gino C.*, *supra*, 224 Cal.App.4th at p. 966 [finding emergency jurisdiction did not "automatically convert to permanent jurisdiction," where Mexico had home state jurisdiction but there was no existing proceeding, explaining "the only apparent avenue for the court to obtain home state jurisdiction over the children is for Mexico to decline to exercise its home state jurisdiction. [Citation.] Since the court opted to remain passive and did not contact Mexico, Mexico has not been given an opportunity to decide whether to exercise its home state jurisdiction. Therefore, the court erred in assuming permanent jurisdiction over the matter."].)

## DISPOSITION

The jurisdictional, dispositional, and subsequent findings and orders are vacated. The matter is remanded to the juvenile court to hold a further hearing regarding UCCJEA subject matter jurisdiction. The matter must be given priority on the calendar and handled expeditiously. If the court determines subject matter jurisdiction existed at the time the action commenced, the court is directed to reinstate its orders. If the court

19

determines there was no subject matter jurisdiction, the court is directed to dismiss the dependency petitions.

O'ROURKE, J.

WE CONCUR:

HALLER, Acting P. J.

AARON, J.