481 So.2d 231 (1985)
Christeen Michelle OWENS, By and Through Her Grandmother and Next Friend, Patsy K. MOSLEY
v.
Virginia Carol HUFFMAN.
No. 56149.
Supreme Court of Mississippi.
November 13, 1985.
*232 Alice Dale Goodsell, John L. Connelly, Jackson, for appellant.
W. Howard Gunn, Jerry Askew, Aberdeen, for appellee.
Before WALKER, HAWKINS and PRATHER, JJ.
HAWKINS, Justice, for the court:
Mrs. Virginia Carol Huffman filed a petition in the Chancery Court of Clay County for custody of her daughter, Christeen Michelle Owens, against her mother, Mrs. Patsy K. Mosley, Christeen's grandmother, who had been awarded custody by an Arizona state court. Mrs. Mosley filed a petition for a writ of habeas corpus based upon the Arizona judgment. The two petitions were consolidated for hearing, and the chancellor heard the petition for habeas corpus first.
At the conclusion of the hearing, the chancellor declined to give full faith and credit to the Arizona order pending a custody hearing to determine what was in the child's best interest. An appeal, however, was permitted Mrs. Mosley on the denial of her petition.
On this appeal we confront the issue of whether the chancellor was bound to give full faith and credit to the Arizona state court order, or was authorized to retain jurisdiction for a full custody hearing.
Persuaded that this child was never afforded the protection of the Uniform Child Custody Jurisdiction Act (UCCJA), and her first opportunity for such protection is in the Clay County Chancery Court, we affirm.
In this pathetic case we are presented the opportunity to analyze the letter as well as the spirit of the UCCJA, and the obligation of a state court to give full faith and credit to a foreign judgment in which the UCCJA was not substantially followed in rendering such judgment.

FACTS
Mrs. Huffman is the natural mother of Christeen, born September 22, 1976, in Denver, Colorado. The father, John Henry Owens, apparently abandoned his wife, Virginia, and their children on or before Christeen's birth. Mrs. Huffman (then Virginia Owens) asked her mother and stepfather, Patsy K. Mosley and Billy Edward Mosley, for help, following which two of the children were adopted through the Colorado Welfare Department, and Mr. and Mrs. Mosley took Christeen. At that time Mr. Mosley (now retired) was employed as an auditor for the Bureau of Indian Affairs, and he and his wife when traveling resided in trailer parks. According to Mrs. Huffman, she wanted Mrs. Mosley to keep Christeen until she was able to look after her.
From 1976 until 1980 Mrs. Huffman tried to get her daughter from her mother, who refused, telling Mrs. Huffman that she had custody and Mrs. Huffman could not have her back. Mrs. Huffman testified she was *233 trying to get into the Air Force in order to hire a lawyer. In June, 1978, however, there was a Petition for Mr. and Mrs. Mosley to adopt Christeen filed in the Chancery Court of Lauderdale County, and Mrs. Huffman signed the Petition and joined in the proceedings. This adoption was never carried through.
Mrs. Huffman, on July 17, 1979, married William H. Huffman, who had four children living with him. Thereafter, Mrs. Mosley agreed for her to have Christeen, and she and Mr. Huffman went to Denver in December, 1979, to get her. On the day they were to leave Christeen got sick, she'd had pneumonia two or three times, and there was a heavy snow on the ground, and heavy snowfall, and because of the weather and her condition, Christeen was left in Denver. In July, 1980, Mrs. Mosley, then living in Sherman, Texas, called Mrs. Huffman to come and get Christeen.
Mr. and Mrs. Huffman got Christeen and returned to Mississippi, where Christeen lived with her mother, Mrs. Huffman, and her stepfather.
On March 7, 1981, there was a "Tiny Miss Clay County Pageant," in which Christeen entered, and Mrs. Huffman invited Mr. and Mrs. Mosley to come for the pageant. Christeen won the pageant.
After the pageant, Mrs. Mosley asked Mr. and Mrs. Huffman if they could take Christeen and the two stepdaughters to the Gulf Coast. Although hesitant, Mrs. Huffman agreed to do so, and Mr. and Mrs. Mosley left with the three children on March 10, 1981. That was the last Mrs. Huffman saw her daughter until two and a half years later.
On March 13, 1981, a deputy sheriff of Clay County returned to the Huffman house in Clay County with the two stepdaughters. Mrs. Huffman asked the deputy where her daughter was, and he replied, "With your parents."
The Huffmans began a series of efforts through law enforcement agencies to get Christeen back. The local officers and officials were reluctant to get involved, so the Huffmans employed private counsel, Mr. Clark Coleman of West Point, to help. Mr. Coleman prepared affidavits for kidnapping, and arrest warrants were issued for the Mosleys. Mr. Coleman was, however, hopeful that some sort of amicable agreement could be made to get the Mosleys to voluntarily return the child.
Mr. Coleman recognized the Huffmans were poor people, unable to afford any kind of extensive legal assistance, and he attempted to work through law enforcement agencies to secure the child's return. After the kidnapping warrants were issued, he was informed at one time by the sheriff's office that the Mosleys were in Mississippi on the way to West Point to return Christeen. He understood that they were supposed to be in on a Saturday afternoon and would come to his office, and Mr. Coleman opened his office and waited for them. They never appeared.
Mrs. Huffman had a card which Mrs. Mosley had given her some time previously which contained the name and telephone number of a Bill Miller, her attorney in Texas. Mr. Huffman telephoned this attorney on March 16, 1981, notifying him Christeen had been abducted. Mrs. Huffman also had two addresses in Sherman, Texas, one which Mrs. Mosley had given her, and another which she had given Mrs. Huffman's stepdaughter. Mrs. Huffman wrote her mother at both addresses.[1] None of the letters were returned.
Mr. Coleman also telephoned Miller and told him what the Mosleys had done, that arrest warrants had been issued, but the Huffmans really wanted the child returned.
Meanwhile, the Mosleys were not idle in Texas. On April 15, 1981, Mr. and Mrs. Mosley, as residents of Sherman, Texas, filed an original petition in the Fifteenth District Court of Grayson County, Texas, *234 seeking to terminate all parental rights of Mrs. Huffman to Christeen. This petition, filed by Louis J. Emerson, Jr., a Sherman, Texas, attorney, specifically alleges that Mrs. Huffman:
1. Voluntarily left the child alone or in the possession of another not the parent and expressed an intent not to return;
2. Voluntarily left the child alone or in the possession of another not the parent without expressing an intent to return, without providing for the adequate support of the child, and remained away for a period of at least six months;
3. Failed to support the child in accordance with their ability during a period of one year ending within six months of the date of the filing of this petition.[2]
Mrs. Huffman was served with a citation on this petition by the Monroe County sheriff's office on April 29, 1981, which she promptly carried to Mr. Coleman. When Mr. Coleman was apprised of the Texas citation by Mrs. Huffman, he first advised the Huffmans they would need local representation in Texas, and suggested they secure such assistance through Legal Services. There was no attempt to get any attorney for Mrs. Huffman in Texas, however, because Mr. Coleman saw no need to following a telephone conversation with Emerson.
Mr. Coleman testified he informed Emerson that the child had been living in Mississippi and the Mosleys had taken off with her, and there was an arrest warrant outstanding. The two attorneys talked about the consequences of the pending criminal charges, and Mr. Coleman asked the Texas attorney to hold up on the "termination procedure." Emerson then informed Mr. Coleman that the Mosleys were no longer in the area.
Mr. Coleman then testified to the following:
A. He told me that the Mosleys were no  this was probably on the second phone call  that the Mosleys were no longer in the area, and I asked him  I know I asked him that because we were thinking about forwarding that arrest out there and see if we couldn't have an arrest made, and we asked him to hold up on the child termination proceedings until the Mosleys got back and it could be discussed for voluntary return of the child, and he informed me that he would not proceed further with the termination without further contacting us, and that's the last contact we had with him.
Following this there was no effort by Mr. Coleman to obtain legal assistance for the Huffmans in Texas.
Unknown to Mr. Coleman and to the Huffmans, a termination decree was entered by the Texas Court on July 9, 1981, and after the Mosleys had moved. This decree recites the same specifics above set out in the petition. It also completely terminates Mrs. Huffman's right as a parent, even removing Christeen's right of inheritance from her mother, Mrs. Huffman, and her natural father.
Back in Clay County the Huffmans were doing all they knew to do to secure Christeen's return. They did not know where the Mosleys were. Pursuing their unsuccessful efforts they began writing letters to prominent state and national officials, President Reagan, United States Senator John C. Stennis, the United States Attorney General, and Attorney General Bill Allain, and pressed the local prosecuting attorney and sheriff for action. The record contains letters of acknowledgment of their requests for help from the U.S. Department of Health and Human Resources dated November 1, 1981; from Senator Stennis, dated February 4, 1981; and from Attorney General Allain, dated May 3, *235 1983. In July, 1981, the Huffmans went to Jackson and conferred with two assistant attorney generals seeking assistance. They prepared posters with a picture and description of Christeen, went on television, sought and were given assistance from a missing child association. The posters were sent to law enforcement officials, and given to truckers. There was a petition to the Governor circulated and signed by a number of people requesting action be taken to arrest the person responsible for the child's kidnapping and for her return. The Grand Jury of Clay County returned a kidnapping indictment against the Mosleys.
The Huffmans' efforts to secure assistance from the authorities were unavailing, and they never learned the location of the Mosleys until September, 1983. At that time Danny Ray Garrett, Mrs. Huffman's brother, telephoned her that he had received a call from Mrs. Mosley, and he gave Mrs. Huffman the telephone number. The Huffmans then took the telephone number to the sheriff's office. Mrs. Huffman testified the sheriff told her his office was handling the matter, and everything would be taken care of, and for her to keep her "nose out of it."
The Huffmans then contacted Mr. Howard Gunn, an Aberdeen attorney. On September 29, 1983, a petition for a writ of habeas corpus was filed in the Chancery Court of Clay County. The petition alleges that Patsy K. Mosley and Billy Edward Mosley as respondents are subject to the jurisdiction of the Clay County Chancery Court, pursuant to Section 93-13-2 et seq. of the Mississippi Code (the Uniform Child Custody Jurisdiction Act), and can be served with a copy of the petition and writ at Mesa, Arizona. The petition concludes with a prayer for a writ directing respondents to appear and produce the child, or to otherwise show cause why custody should not be restored to the petitioner Mrs. Huffman. The chancellor on September 30, 1983, entered a fiat specifically citing the provisions of Section 93-23-1 et seq. of the Code, and set a hearing on the matter for October 7, 1983. The sheriff of Clay County was directed to take the body of Christeen and bring her forthwith before the Chancellor. Summons was also issued by the chancery clerk of Clay County to be served upon the respondents in Clay County. The sheriff of Clay County made a return on the process that the respondents were not found.[3]
Mrs. Huffman testified they were unable to get any assistance, either in having arrest warrants served in Arizona, or summons on the writ of habeas corpus. Mrs. Huffman, through Mr. Gunn, was able to get local counsel in Arizona. The services of Mr. Jeremy Butler of the law firm Lewis and Roca of Phoenix were secured. In October, 1983, Mr. and Mrs. Huffman flew to Phoenix and were met at the airport by Mr. David Lee Titterington of this law firm. The law firm apparently prepared a petition for custody in the state court of Arizona.[4] The first address given the Huffmans proved to be a ball park.
The final order of the Arizona court is the only record of what transpired in that state court, except for the testimony of the Huffmans in the Clay County court. According to them Christeen was taken into custody by the authorities, but Mrs. Mosley produced a copy of the July, 1981, Texas decree. It was then that the Huffmans first learned there had been any judgment rendered on the Texas proceeding. When *236 she produced the Texas decree, the child was returned to Mrs. Mosley. Mr. Huffman telephoned the district attorney's office in Starkville about the kidnapping warrant. The Arizona trial court proceedings were continued, apparently due to the impact of the Texas decree.
The Huffmans returned to Arizona in the early part of 1984. She testified she was then told if she did not sign a custody agreement her attorneys had worked out she would never see her child again.[5]
Mrs. Huffman testified as follows:
As I started to say, I was told if I didn't sign it I wouldn't see Christie. I was told that I would not ever see her again. I love that kid. I gave life to that kid. [R.63]
Whatever Mrs. Huffman signed was not introduced into evidence, but a certified copy of the Superior Court of Maricopa County, Arizona, Stipulated Order of April 9, 1984, was introduced. It is as follows:
Pursuant to the Stipulation of the parties announced in open Court on March 1, 1984,
IT IS HEREBY ORDERED, ADJUDGED AND DECREED as follows:
I. This Court has jurisdiction of the subject matter of this proceeding and over the parties inasmuch as Christeen Michelle Owens has resided in Maricopa County, State of Arizona, for more than two years.
II. The custody of Christeen Michelle Owens is hereby awarded to her maternal grandmother, Patsy K. Mosley, subject to the visitation rights set forth herein awarded to the child's mother, Virginia Carol Huffman:
A. At any time that the mother is in Maricopa County, state of Arizona, the mother shall have the right to visit with the child at any reasonable time and place.
B. Commencing on or about June 1, 1984 and for each summer recess thereafter, the mother shall have visitation rights at her home in the State of Mississippi or such other place that she may be residing. The visitation rights shall commence three days after the last day of school before the regular school summer recess which shall continue for three weeks thereafter. The period of visitation shall be increased by one week each summer thereafter [sic] commencing the summer of 1985 until reaching six weeks. The child shall travel by coach class airline ticket to Memphis, Tennessee or such other place as the parties shall mutually agree upon. The expense of round trip air fair shall be paid in advance, the child may travel unaccompanied. In the event the travel is by other means of transportation, then the child shall be accompanied by an adult but respondent, Patsy K. Mosley, shall provide equivalent funds of the airfare toward the transportation costs.
C. The visitation rights during the Christmas holidays shall include the right of the child to travel to the mother's residence two days after the last day of school before the Christmas holiday and shall extend for seven days. Petitioner, Virginia Carol Huffman, shall be responsible for the round trip air fare for such visitation and the other terms and conditions of the travel regarding summer visitation shall apply.[6]
*237 In June, 1984, Christeen came to Mississippi, and Mrs. Huffman on July 10, 1984, filed a petition in the Chancery Court of Clay County for custody of her child, alleging in summary the facts above related, that she agreed to the Arizona stipulation because of the refusal of the law enforcement authorities to help her, and after being told any custody would be subject to change.
On July 12, 1984, Ms. S. Allan Alexander filed a petition for a writ of habeas corpus in the Chancery court of Clay County on behalf of Mrs. Mosley, and made oath to it. She attached a copy of the Arizona order to the petition. By agreement of the parties, both petitions were consolidated and set for July 16, 1984.
At the hearing, the chancellor placed the petition for writ of habeas corpus to be heard first. Counsel for Mrs. Mosley offered an authenticated copy of the Arizona court order and rested.
The Huffmans and Coleman then testified to the facts above related. Danny Ray Garrett, the brother of Mrs. Huffman, testified he had given his sister the telephone number, following which his mother called him and told him to say his prayers, "I'm coming after you." He further testified, "I was very scared. I'd received threats like that in the past." Harold Ray Garrett, Mrs. Huffman's natural father, also testified. The family lived in South Carolina, and he told of efforts his daughter had made in 1981 to locate Christeen, and he had reported it to the law enforcement officials, giving them pictures and information about Christeen.
In rebuttal Mrs. Mosley offered copies of depositions of Emerson and an attorney in Meridian, which were taken during the pendency of the Arizona state court proceedings. Emerson deposed that he had no recollection of Coleman ever making a request for an extension of time in the Texas proceedings.[7] The Meridian attorney was deposed concerning the 1978 petition for adoption.
Both sides then rested on the petition for the writ of habeas corpus.
The chancellor stated into the record that there was neither proof nor allegation but that Christeen would be well cared for, by either the grandmother or mother. Counsel for Mrs. Mosley responded:
Your Honor, we have no evidence to present to the Court, obviously, or we would; but we have no evidence to present that we feel is of such  that rises to the quality we should even want to present to the Court.
The chancellor then rendered an opinion denying the petition for a writ of habeas corpus, but making no final decision on custody, leaving this issue pending. The chancellor held that the Mississippi courts had jurisdiction over Christeen as a minor, which could not be divested by the wrongful conduct of the Mosleys. He stated the factual finding of the Texas court was "not grounded in reality." He further found that the filing of a petition for a writ of habeas corpus in the Chancery Court of Clay County on September 29, 1983, vested this court with jurisdiction under the Act, and the pendency of this proceeding was sufficient for the Arizona court to have declined jurisdiction.[8]
In his opinion the chancellor stated:

*238 It is presumed, under the law, that the natural mother is entitled to custody of her child. There are no allegations before this Court of abuse or neglect or anything to give doubt or cause the Court to question that presently the child, either in the custody of the grandmother or mother, would not be properly cared for. In fact, counsel for the parties have so stipulated. From July of 1980 until the child was wrongfully taken, the state of residence of the child was Mississippi; and jurisdiction was vested in this Chancery Court. For this Court to now hold that the Uniform Child Custody Act technically precludes the mother of custody and this state of its jurisdiction would, in fact, defeat the intended purpose of the Act in that it would reward the wrongdoer. It was the grandmother that wrongfully secreted the presence of the child. Regardless of how many safeguards may be installed in a system, in spite of those safeguards, rather than on account of them, systems do occasionally go awry, which is precisely the case here. For the authorities to take the position and now tell this mother, "You cannot have the custody of your child," because of a hypertechnicality, when the authorities provided little or no assistance in locating the child from the outset would, in the opinion of this Court, be an injustice. To now rule that the state of residence of the grandmother is the state of jurisdiction would be to reward the initiator of a wrong. Neither the grandmother, by abducting the child, nor the mother, upon submitting herself to the Arizona court, can defeat the rights of this child and deprive or relieve this Court of its constitutional duty. Original jurisdiction was, is, and remains vested in this Chancery Court of the State of Mississippi. [Emphasis added]
The chancellor concluded that for the purpose of determining custody, Mississippi was the state of original jurisdiction, and this matter was properly before the court pursuant to the petition filed September 29, 1983.

LAW
The basic issue before us is the authority of the Chancery Court of Clay County to proceed with a best interest hearing in this case. Or, does the Arizona state court order deprive a Mississippi court of this authority?
Our decision must comport with Article IV., § 1 of the United States Constitution requiring us to give full faith and credit to the judicial proceedings of a sister state. Likewise, we must comply with Title 28, Section 1738A USCA, Parental Kidnapping Prevention Act of 1980 (PKPA), and our own Uniform Child Custody Jurisdiction Act, Miss. Code Ann. § 93-23-1 et seq. (UCCJA).
We are not concerned with whether Mrs. Huffman as an individual might be precluded from relief, but whether her child is barred from any relief by a Mississippi court. Considerations of fairness and equity would impel us to say that the Chancery Court of Clay County should be able to proceed, because in the entire pathetic history of this child, the first opportunity she has ever had for a full-blown hearing for her own best interest is in that court.
For a proper analysis of this most unusual case, we need to briefly note the state of the law prior to the enactment of the PKPA and the UCCJA by the several states, the purposes of the Acts, and then determine whether the chancellor violated their provisions.
Prior to the enactment of the state and federal acts, there would be no question of authority of the Clay County Chancery Court to proceed. In Latham v. Latham, 223 Miss. 263, 150, 78 So.2d 147 (1955), we stated:
The rule is well established by the great weight of authority that jurisdiction in child custody cases does not depend upon legal domicile but where the child is actually residing and physically present within the territorial jurisdiction of the court, such court takes and has such jurisdiction by virtue of the doctrine of parens *239 patriae regardless of the legal domicile of the child.
We further held in Latham, following the great weight of authority, that since a Louisiana court could modify a child custody decree, Mississippi could likewise modify it, 78 So.2d at p. 151.
Latham was, and is in accord with decisions of the United States Supreme Court involving child custody cases under the Full Faith and Credit Clause of the United States Constitution, Article IV., § 1. See: Webb v. Webb, 451 U.S. 493, 101 S.Ct. 1889, 68 L.Ed.2d 392 (1981); Ford v. Ford, 371 U.S. 187, 83 S.Ct. 273, 9 L.Ed.2d 240 (1962); Kovacs v. Brewer, 356 U.S. 604, 78 S.Ct. 963, 2 L.Ed.2d 1008 (1958); May v. Anderson, 345 U.S. 528, 73 S.Ct. 840, 97 L.Ed. 1221 (1953); and People of the State of New York v. Halvey, 330 U.S. 610, 67 S.Ct. 903, 91 L.Ed. 1133 (1947) (holding New York could lawfully change a Florida custody decree because Florida had the right under Florida law to change the decree).
Unfortunately, the power of each state to litigate anew the custody of a child based solely upon his presence in the state encouraged parents in child custody disputes to abduct a child and carry it to another state in order to have the most favorable forum for a custody lawsuit. While the two Acts are directed to child custody disputes which occur between parents, the conduct of the Mosleys in this case is a striking example of the evil PKPA and UCCJA are designed to discourage and prevent. Thus, two of the main purposes of PKPA were to discourage forum shopping and prevent interstate abductions, or "child snatching" of children for the purpose of obtaining custody. See: Tufares v. Wright, 98 N.M. 8, 644 P.2d 522 (1982); Belosky v. Belosky, 97 N.M. 365, 640 P.2d 471 (1982). Likewise, one of the purposes of UCCJA is to deter abductions and other unilateral removal of children to obtain custody awards. See: § 1(a)(5) of Uniform Child Custody Jurisdiction Act. See also: Van Haren v. Van Haren, 171 N.J. Super. 12, 407 A.2d 1242, 1245 (N.J. 1979); Fry v. Ball District Judge, 190 Colo. 128 544 P.2d 402, 405 (Colo. 1975).
This Court's adherence to the salutary purposes of the Acts as been recently demonstrated in Walker v. Luckey, 474 So.2d 608 (1985), where we reversed and rendered a chancery court decree that had modified an out-of-state custody order. That case involved a foreign judgment whose initial validity was never brought into question.
In this case we are called upon to examine something quite different: here we are concerned with enforcement of a foreign decree, the jurisdiction for which was acquired by one party's criminal conduct and flagrant violation of both Acts, conduct which, if it had been brought to the attention of the out-of-state court, would almost surely have occasioned a radically different result. Stated differently, if it appears the foreign court's proceeding fell far short of the requirements of the UCCJA, is a court of this state obligated to carry it out?
While we are not called upon to pass upon its validity, the Texas judgment is not entitled to full faith and credit. This becomes apparent first by consideration of the PKPA. In July, 1981, Texas had not adopted the UCCJA, but did come under the PKPA, which on this record precluded a Texas court from assuming jurisdiction. In order to be authorized to proceed for a custody determination, it was necessary that Christeen have lived with the Mosleys for six consecutive months in Texas preceding commencement of the proceedings, or that no other state would have had jurisdiction, or Christeen had been abandoned, or some emergency existed. The unsworn petition to terminate the parental rights of Mrs. Huffman was filed April 15, 1981, barely one month after the child's abduction, and the final judgment terminating all parental rights was entered July 9, 1981, not quite four months after fleeing Mississippi with the child. See: Title 28, Section 1738A(a), (b)(1), (2), (4), (c)(1), (2).[9]
*240 Furthermore, if the judgment in the Texas court was anything more than a judgment by default, vital facts were withheld from the court to give it jurisdiction. Had that court been made aware that Christeen was in Texas as a result of a March, 1981, kidnapping in Mississippi, and that a warrant for the arrest of the Mosleys was outstanding, it is inconceivable to us that the trial judge would have proceeded.[10]

UNDERSTANDING WHAT HAPPENED IN ARIZONA
The only record we have of the Maricopa County Superior Court of Arizona is that court's order dated April 9, 1984. It is important, however, that we understand the circumstances preceding its rendition as best we can from the testimony given at the Clay County chancery proceeding.
It would be difficult to envision a person who has been so ill-served by persons who might have helped her as Mrs. Huffman.
Of course, what transpired prior to July, 1980, when she got her daughter from the Mosleys is not material to our present decision. We do note, however, that in the most desperate of circumstances in 1976, Mrs. Huffman turned to her mother for help. Mrs. Mosley was willing to take the little baby Christeen, but did not take the two little boys. The record is silent as to whether she offered to help her daughter with the boys. Mrs. Huffman either had to, or in her abandonment thought she had to give the little boys up for adoption. It is perhaps no more reflective on the mother than the grandmother in this case that the two boys were given up for adoption.
Mrs. Huffman kept after Mrs. Mosley for her baby's return until the latter relented *241 in 1979. In July, 1980, the child, now almost four years old, was back with her mother.
Eight months later Mrs. Mosley and her husband kidnapped the child. Mrs. Huffman was frantic; she turned everywhere she could for help. It is difficult for this Court to conceive how the law enforcement agencies and officials, both state and federal, were of so little help. See: Pub.L. No. 96-611, § 9, 94 Stat. 3571; § 10, 94 Stat. 3573. She was entitled to state as well as federal assistance. See: 18 U.S.C.A. § 1201, § 97-3-51 Miss. Code Ann. (1972).
It is appalling that Mrs. Huffman's Mississippi attorney, upon being notified a suit to terminate her rights was pending in a Texas court, did not see that some kind of response was made. Yet, Mr. Coleman was told when he called Emerson in April, 1981, that the Mosleys had already departed (thus they could not be found to be arrested on the kidnapping charges), and that nothing further would be done without contacting him. No doubt he assumed the Texas petition would not proceed to a hearing.[11]
It is inconceivable to us that had the Texas trial judge been informed by the two Texas attorneys, both of whom appeared before him at the parental termination hearing and had been informed of the facts, that the Mosleys had abducted Christeen from Mississippi and state warrants had been issued for their arrest, that he would ever have entered the order.
Not only did the Mosleys kidnap this child and secrete her from her mother, they sought by a petition in a Texas court to remove all parental rights which Mrs. Huffman had in her child, and all rights which Christeen had with her natural mother. A more calloused cruelty is difficult to envision.[12]
The Mosleys furthermore made false representation to the Texas court that Mrs. Huffman had left Christeen in the possession of another and expressed an intent not to return, had provided no support and remained away for at least six months, and failed to support the child. We must conclude they concealed from the court that they had abducted the child in Mississippi.
Before the Texas decree was ever entered, the Mosleys had skipped again, and for the next two years Mrs. Huffman was totally in the dark about her child. Was she sick, was she well? Was she living, was she dead?
Finally, in September, 1983, Mrs. Huffman learned, not from any federal or state agency designed and charged by law to help locate kidnapped children, but from her brother, a telephone number of the Mosleys.
The Huffmans then secured the assistance of Mr. Howard Gunn, who filed the appropriate petition.[13] The record does not make clear why the Mississippi writ was never served on the Mosleys. About the same time the Clay County UCCJA proceeding was instituted, Mr. Gunn was able *242 to procure for Mrs. Huffman the services of reputable and prestigious law firm in Phoenix.[14] It is apparent this eminent law firm acted with alacrity. They took action in the Arizona state court, the Mosleys were located, the child recovered.
Then transpires the strangest part of this depressing story.
Why would a mother who had been wildly searching for and seeking to recover her child for three years suddenly agree to give custody to Mrs. Mosley?
In the absence of some quite special circumstances, Arizona courts are no different from Mississippi as to who should have custody of a child in a suit between a parent and a grandparent. Custody will be awarded to the parent. Then why would competent counsel ever advise Mrs. Huffman it was in her best interest to give custody to Mrs. Mosley, that otherwise she might never see her child again? Not one insinuation has ever been made that Mrs. Huffman is an unfit mother.
The record is silent. We can only conclude, and this is but surmise, that the reason for this advice was the Texas judgment. Enforcement of that judgment would mean that Mrs. Huffman could never see her child. There would be no rights for Mrs. Huffman, there would be no parental rights for Christeen.
If this were the reason, then fear and apprehension by the Arizona attorneys prevented the Arizona court from hearing the background of this case, and then making a determination of what was in this little girl's best interest.
Thus, the Arizona court never considered the polestar issue in any child custody hearing: the best interest for the child.
When that happened, not only was Mrs. Huffman ill-served, but her daughter as well.

WHAT THIS MEANS UNDER UCCJA
This child's fate should never have been determined without a full-blown hearing as to what was in her best interest.
Christeen never received such a hearing. Should she be deprived of one by the state which has the most connections to her welfare, where the facts can be fully developed by resident witnesses (except for the Mosleys)?
If we deny Christeen this hearing, the very purposes of the PKPA and UCCJA have been frustrated, because in the end analysis, their purpose, too, is to secure what is in the best interest of the child.
As we view the UCCJA she should not be denied the hearing.
The Arizona court did not have jurisdiction under the PKPA or UCCJA.[15]

FIRST REASON
Prior to commencement of the Arizona action, a child custody proceeding under UCCJA was commenced in Mississippi.
Title 28, § 1738A(g) prohibited Arizona from exercising jurisdiction under the circumstances.
Miss. Code Ann. § 93-23-11(1) of our Act and § 8-406(A) of the Arizona Act prohibited that court from proceeding.[16] See: *243 Clark v. Clark, 404 N.E.2d 23 (Ind. App. 1980); Smith v. Smith, 40 Or. App. 257, 594 P.2d 1292 (1979).

SECOND REASON
The second reason comes from our interpretation of both Acts' language and their purposes.
The UCCJA requires a number of considerations before a court exercises jurisdiction under the Act. We will not dwell upon the guidelines of Miss. Code Ann. §§ 93-23-5 and 93-23-13,[17] but go directly to § 93-23-15.
This was a case of a child which had been abducted from its natural mother in Mississippi by a grandparent and a stepgrandparent. As we have mentioned, both PKPA and the UCCJA of the states were enacted primarily to stop parents from abducting children. The Acts' emphasis is upon wrongdoing parents. They apply, however, to others as well.
Until a child has been awarded custody to one parent by a court decree, each parent has equal legal right to its custody. Absent a custody decree prohibiting it, a parent has done nothing illegal in removing a child to another state. Therefore, under § 93-23-15 there is a two-tiered guideline for a court in determining whether it shall exercise jurisdiction, the first discretionary, the second mandatory.
The first paragraph provides that if a petitioner has wrongfully taken the child to another state in the absence of any custody decree, the court may decline to exercise jurisdiction.
The second paragraph is mandatory. It states that "unless required in the interest of the child," the court shall not modify a custody decree of another state if the petitioner has wrongfully removed the child from that state.[18]
What do these sections mean as between parents? They mean that if, in the absence of any child custody decree, a parent wrongfully takes a child to another state, the court may decline to exercise its jurisdiction.
But, if there has been a custody decree awarding custody to one parent, and the other parent wrongfully takes the child to another state and seeks to secure a custody change, the court shall not exercise jurisdiction. See: Neger v. Neger, 93 N.J. 15, 459 A.2d 628, 633-635 (N.J. 1983); Buchanan v. Malone, 415 So.2d 259 (La. App. 1982).
This simply means that if there has been a legal determination that one parent has custody, when the other parent seeks to circumvent that legal determination by a court of another state, it cannot be done.
In this case, however, there was no necessity for a court order to give Mrs. Huffman custody. She was the custodian by operation of law and by nature. The Mosleys (as opposed to a parent) violated the law in abducting the child. The Mosleys are entitled to less protection under the Act than a parent violating a court order. What the Mosleys did in reference to this child was not simply wrong, it was illegal, and they violated serious criminal laws of this state.
We have no hesitancy in stating that under the laws of this state, and our interpretation of the Act, that if the Mosleys *244 had abducted this child from the mother in Arizona, no court of this state would be authorized to exercise jurisdiction except in a clear showing that the child's interest required it. See: Hill v. Hill, 481 So.2d 227 (Miss. 1985). And, of course, there was no showing whatever as to it being in Christeen's interest for the Arizona court to take jurisdiction.[19]
As was observed by the New Jersey Supreme Court in E.E.B. v. D.A., 89 N.J. 595, 446 A.2d 871, 879 (N.J. 1982):
A custody dispute is more than a jurisdictional chess game in which winning depends on compliance with predetermined rules of play. A child is not a pawn. In exercising its discretion within the confines of UCCJA and PKPA, a court should consider not only the literal wording of the statutes but their purpose: to define and stabilize the right to custody in the best interest of the child.
In Smith v. Smith, 594 P.2d 1292, 1296 (Ore. 1979), the court stated: "Jurisdiction exists only if it is in the child's interest, not merely the interest or convenience of the feuding parties, to determine custody in a particular state."
Most especially in a child custody hearing, this state adheres to the wisdom expressed in Clark v. Clark, 404 N.E.2d 23, 34 (Ind. App. 1980):
Since the organization of our state government it has been the established policy of the law to regard the minor children of divorced parents as wards of the court in the same general way that minor children of deceased parents are regarded.
* * * * * *
[A]lthough our procedural rules are extremely important, it must be kept in mind that they are merely a means for achieving the ultimate end of orderly and speedy justice. We must examine our technical rules closely when it appears that involving them would defeat justice; otherwise we become slaves to the technicalities and they acquire the position of being the ends instead of the means.
Should the chancellor have said that a child who has been treated as this child has no right to a hearing in the one forum best equipped to hear all relevant evidence as to what is in her best interest? Was the Clay County Chancery Court precluded from proceeding simply because the natural mother through ignorance, indigency and inadequate counseling and assistance has been so thoroughly checkmated by our legal system?
The chancellor viewed the matter, not as a contest between a mother and a grandparent, but a proceeding in which he had the most somber obligation to look out for the welfare of this child.
The chief beneficiary of such a hearing is the child, the benefit to any other party is incidental.
The chancellor's ruling in this case was in accord with the spirit and purpose of PKPA and UCCJA. The circumstance of this case, under which this child has never had the benefit of a hearing to determine her best interest, in and of itself authorized *245 the Clay County court to proceed under the Act.
E.E.B. v. D.A., supra, was a dispute between the natural mother and adoptive which began in Ohio. While the case was on appeal, the adoptive parents moved to New Jersey. The natural mother was successful on appeal, and sought to enforce a habeas corpus writ in New Jersey. The adoptive parents filed a petition for a best interest hearing in New Jersey. The New Jersey Supreme Court held that the failure of Ohio to conduct a hearing for the best interest of the child authorized New Jersey to conduct such a hearing under both PKPA and UCCJA.
In Baird v. Baird, 374 So.2d 60 (Fla.App. 1979), the father moved to dismiss a petition of the mother in a Florida state court to modify an Arizona custody order, alleging Arizona was the home state, and under the Act the Florida court did not have jurisdiction. The trial court denied the father's motion, and assumed jurisdiction for the best interest of the child, holding that the mother had significant connections with Florida, that the mother "may not have been adequately" represented by Arizona legal counsel, and that she lacked sufficient funds to go to Arizona. The trial court awarded temporary custody to the mother. The Florida District Court of Appeals affirmed, giving the same reason as the trial judge in assuming jurisdiction.
In re Marriage of Hopson, 110 Cal. App.3d 884, 168 Cal. Rptr. 345 (Cal.Ct.App. 1980), the father wrongfully took his two children from California to Tennessee (although it is not certain that in so doing he violated a custody decree), and initiated proceedings in Tennessee to modify an Arizona custody decree. The Tennessee state court overruled the mother's motion to dismiss for lack of jurisdiction, proceeded to hear the matter, and seventeen months later entered a final judgment awarding custody to the father.
Thereafter the mother in California sought enforcement of the Arizona custody order, and to cite the father for contempt of the Arizona decree. The father moved to dismiss the California proceedings because the mother had appeared and fought the custody issue in Tennessee, giving that court jurisdiction, and the California proceedings were a collateral attack on a final judgment. The trial court sustained the father's motion and dismissed. In reversing, the California Court of Appeals observed that the res judicata effect of a custody decree was dependent upon the court having personal and subject matter jurisdiction, and the exclusive method of determining subject matter jurisdiction in child custody cases was the UCCJA, which superseded any contrary decisional and statutory law (pp. 350-351). The court then pointedly observed. "There is no provision in the act for jurisdiction to be established by reason of the presence of the parties or by stipulation or consent." (P. 351) [Emphasis added]
The court noted that the filing of the Tennessee decree in a California court did not in and of itself mandate enforcement. Under Section 5162 of the California Act (§ 93-23-25), it was incumbent on the California court to first determine if the Tennessee order was made "substantially in accordance" with the standards of the Act before it could be enforced under Section 5164 of their Act (§ 93-23-29). The court found that Tennessee was not the "home state" under § 5152(1)(a) of California's Act [§ 93-23-5(1)(a)], and while the Tennessee court conceivably had jurisdiction under § 5152(1)(b) of California's Act [§ 93-23-5(1)(b)], the manner in which the children were taken to Tennessee directly conflicted "with the spirit of the legislation." (P. 353)
The paramount concern of the Act, the court held, is the welfare of the child.
The court went on to say that even if the Tennessee court had jurisdiction under § 5152(1)(b) [our § 93-23-5(1)(b)], the Tennessee court was required to refuse jurisdiction because in so doing it modified the Arizona decree in violation of their § 5157(2) [our § 93-23-15(2)], noting "the above provision of Section 5157 subdivision (2) clearly distinguishes illegal removal or *246 detention from all other custody violations." (P. 355)
The court then stated:
Giving recognition to the Tennessee decree condones the father's behavior and encourages unlawful abductions; it invites parental manipulation and deceit, while undermining the basic parent-child relationship.
* * * * * *
We conclude that given the clear purpose and policy of the UCCJA to deter childnapping, the Tennessee court failed to comport with jurisdictional standards substantially in accordance with the UCCJA. [Pp. 355-356]
The court further said:
The record also indicates that Tennessee made no determination that it was the more appropriate forum to hear the matter of custody than either Arizona or California.
* * * * * *
Substantial evidence indicating a total absence of procedural safeguards in conformity with those established by the UCCJA further supports our conclusion that the Tennessee judgment was not entitled to full faith and credit.
The court concluded:
The Act does not support an interpretation which would encourage the very evils the Commissioners on Uniform State Laws intended to eradicate. [P. 359]
* * * * * *
This case, like most child custody matters involves a collison of principles as well as of intransigent would-be custodians of the hapless children, innocent subjects of a conflict they can never understand. The primary principle of the child's best interest is never easily applied once the litigants themselves have succeeded in creating the disruption of shifting custody as has happened in this case. The court can only repair, patch and cover over, as best they can, the irreparable harm occasioned and reduce the harm to a minimum, if the minimum is discernible.
In Freeman v. Freeman, 547 S.W.2d 437 (Ky. 1977), the mother, in violation of a Florida court order, took the child to Kentucky and secreted her whereabouts from the father. After a series of court battles, the Kentucky trial court declined jurisdiction and gave full faith and credit to the Florida decree. On appeal the mother argued Kentucky was the "home state" under the Act. In affirming the trial court's action, the Supreme Court stated:
... [W]e observe that the child and the mother have no significant connection with this state other than the period of time the child was secreted here from the father and before the father commenced his action in court. We do not regard a period of time in this state where a child is hidden from the other parent as having any effect on giving the child a "home state" status.
Our observation is that the "best interest" of the child has been lost in the thicket of the wishes of the parents here... .
The Freeman case involved one parent against another. How much stronger the reason for our decision in this case in which a grandparent abducted a child from her natural parent, who, insofar as this record shows, was a good mother.
In this case, no fault should be assessed against the Arizona court in entering its order, because the parties did so by stipulation, and no doubt the court thought in so doing it was ending the turmoil. That does not remove the stigma, however, of that court never having made a determination pursuant to the standards of the Act. It also renews the wisdom that a court in a child custody case should never enter an order in the absence of sufficient hearing under the circumstances of each case to make its own determination to its own satisfaction that its order will truly be in the child's best interest.
It is manifest from the record in this case that the Arizona court did not have the authority ("subject matter jurisdiction") *247 under the UCCJA to enter a permanent custody order in this case. Its effect, if any, upon the adult contestants we are not required to address. Because the polestar issue of this child's best interest remains unsettled, and because the Arizona proceedings were not substantially in accordance with the Act, and did not meet the jurisdictional standards of the Act, see § 93-23-25, the Chancery Court of Clay County was not required to give full faith and credit to that court's order. The Chancery Court of Clay County has full authority to conduct a custody hearing under the Act.
AFFIRMED.
PATTERSON, C.J., WALKER and ROY NOBLE LEE, P.JJ., and DAN M. LEE, PRATHER, ROBERTSON, SULLIVAN and ANDERSON, JJ., concur.
NOTES
[1] Mrs. Huffman made photostatic copies of one of the letters she wrote Mrs. Mosley in Texas, which is in the record.
[2] A glaring omission from the petition is any information as to how the child happened to be in Texas.
[3] The record does not disclose whether process was ever attempted to be had on the respondents under the long arm statute Miss. Code Ann. § 13-3-57, and pursuant to Miss. Code Ann. § 93-23-9.
[4] We can only gather that Arizona counsel prepared a petition on behalf of Mrs. Huffman because the Arizona state court order of April 9, 1984, shows Mrs. Huffman as plaintiff and the Mosleys as defendants.

The record is silent as to whether the Arizona attorneys were ever informed of the pendency of a custody hearing in the Chancery Court of Clay County under the Act. It is apparent that the state court proceedings in Mississippi, as well as other pertinent facts, were never called to the attention of the Arizona trial judge. Otherwise, he would not have proceeded. See Title 28, Section 1738A(g) USCA; Miss. Code Ann. § 93-23-11; Arizona Statutes § 8-406.
[5] There was some substance to this statement. The Texas order terminated the parent-child relationship between Mrs. Huffman and her daughter.
[6] The remainder of the order reads:

III. Upon the execution of this Order, the respondents shall immediately institute appropriate proceedings to dismiss the petition for adoption filed in the Chancery Court of Lauderdale County, Mississippi, Cause No. A-1151 or any other proceeding instituted by them in Mississippi.
IV. Further, upon execution of this Order, the respondents shall dismiss any further proceeding in the 15th Judicial District Court of Grayson County, Texas, being Cause No. 94206 with the provision that any order or decree of termination of petitioner's parental rights including, but not limited to the order entered July 9, 1981, by said court, shall be null and void and of no further effect.
V. Petitioner shall, to the extent permitted by her, dismiss any proceedings pending against the respondents in the State of Mississippi.
VI. In the event it is determined that it is necessary for this Order to be reiterated by any other division of this Court including the Juvenile Division, petitioner agrees that an equivalent order may be entered therein.
DONE IN OPEN COURT this 16th day of April, 1984.
[7] Unfortunately, Mrs. Huffman's Arizona attorney never asked Emerson if Mr. Coleman had told him the child had been kidnapped from Mississippi, and whether he had informed the Texas trial judge the child had been abducted. Nor was he asked if Miller, the guardian ad litem in the Texas proceeding, had told the court the reason the child was in Texas.
[8] The chancellor failed to note that apparently the Arizona state court was never apprised of any proceedings pending in the Mississippi Chancery Court.
[9] These sections of the Act read as follows:

§ 1738A. Full faith and credit given to child custody determinations
(a) The appropriate authorities of every State shall enforce according to its terms, and shall not modify except as provided in subsection (f) of this section, any child custody determination made consistently with the provisions of this section by a court of another State.
(b) As used in this section, the term 
(1) "child" means a person under the age of eighteen;
(2) "contestant" means a person including a parent, who claims a right to custody or visitation of a child;
* * * * * *
(4) "home State" means the State in which, immediately preceding the time involved, the child lived with his parents, a parent, or a person acting as parent, for at least six consecutive months, and in the case of a child less than six months old, the State in which the child lived from birth with any of such persons. Periods of temporary absence of any such persons are counted as part of the six-month or other period;
* * * * * *
(c) A child custody determination made by a court of a State is consistent with the provisions of this section only if
(1) such court has jurisdiction under the law of such State; and
(2) one of the following conditions is met:
(A) such State (i) is the home State of the child on the date of the commencement of the proceeding, or (ii) had been the child's home State within six months before the date of the commencement of the proceeding by a contestant or for other reasons, and a contestant or for other reasons, and a contestant continues to live in such State;
(B)(i) it appears that no other State would have jurisdiction under subparagraph (A), and (ii) it is in the best interest of the child that a court of such State assume jurisdiction because (I) the child and his parents, or the child and at least one contestant, have a significant connection with such State other than mere physical presence in such State, and (II) there is available in such State substantial evidence concerning the child's presence or future care, protection, training, and personal relationships;
(C) the child is physically present in such State and (i) the child has been abandoned, or (ii) it is necessary in an emergency to protect the child because he has been subjected to or threatened with mistreatment or abuse;
(D)(i) it appears that no other State would have jurisdiction under subparagraph (A), (B), (C), or (E), or another State has declined to exercise jurisdiction on the ground that the State whose jurisdiction is in issue is the more appropriate forum to determine the custody of the child, and (iii) it is in the best interest of the child that such court assume jurisdiction; or
(E) the court has continuing jurisdiction pursuant to subsection (d) of this section.
[10] Also, since Texas had not adopted the UCCJA in July, 1981, in order to entitle the Texas order to recognition in this state it would be necessary that the Texas proceeding have sufficiently followed the provisions of UCCJA to warrant our recognition. See: In re: Marriage of Hopson, 110 Cal. App.3d 884, 168 Cal. Rptr. 345 (1980).
[11] Also in Mr. Coleman's defense, he probably thought with the Mosleys having left Texas, coupled with what he informed the Texas attorney, no attorney in his right mind would proceed to an adoption hearing with two kidnappers as clients. And of course they would not have, had there been any kind of answer filed on behalf of Mrs. Huffman. An answer would have sent the Texas proceeding up in smoke. The Mosleys gambit paid off in Texas, again, because Mrs. Huffman was ill-served.
[12] The letter from Mrs. Huffman to her mother in 1981, at the Sherman, Texas, address is heartrendering. The following excerpt is illustrative:

But now I feel I've lost the only father I ever loved and my mother but most of all my daughter. Mom, we both know I can't have any more children, wasn't losing John and Billy enough or do I have to lose everything I've always wanted. We both know [something to the effect she can have no more children], and even though I have 4 step children who I love dearly there is still and emptyness [sic] that I can't fill. And can't help but remember when I found out I was pregnant with Christie and told you the first thing you said was get an abortion. How do you feel about that now?
[13] Until then, any civil action would have been unavailing. The location of the child was unknown.
[14] The record does not reveal whether the services were pro bono or not.
[15] In 1978 Arizona adopted the UCCJA in a form which is almost identical to ours.
[16] Title 28, § 1738A(g) reads:

(g) A court of a State shall not exercise jurisdiction in any proceeding for a custody determination commenced during the pendency of a proceeding in a court of another State where such court of that other State is exercising jurisdiction consistently with the provisions of this section to make a custody determination.
Miss. Code Ann. § 93-23-11(1) reads:
A court of this state shall not exercise its jurisdiction under this chapter if at the time of filing the petition a proceeding concerning the custody of the child was pending in a court of another state exercising jurisdiction substantially in conformity with this chapter, unless the proceeding is stayed by the court of the other state because this state is a more appropriate forum or for other reasons.
Section 8-406 of the Arizona Act is the same as Miss. Code Ann. § 93-23-11.
As we have noted, we have no way of knowing if the Arizona court was ever apprised that a petition under the Act had been filed in Clay County of September 29, 1983, and the chancellor issued a fiat in the case September 30, 1983.
[17] As we noted, Footnote 15, the Arizona Act reads the same as §§ 93-23-5, -13, and -15.
[18] The relevant portions of this section read:

§ 93-23-15. Jurisdiction declined by reason of petitioner's conduct.
(1) If the petitioner for an initial decree has wrongfully taken the child from another state or has engaged in similar reprehensible conduct the court may decline to exercise jurisdiction if this is just and proper under the circumstances.
(2) Unless required in the interest of the child, the court shall not exercise its jurisdiction to modify a custody decree of another state if the petitioner, without consent of the person entitled to custody, has improperly removed the child from the physical custody of the person entitled to custody or has improperly retained the child after a visit or other temporary relinquishment of physical custody. .. .
[19] The Arizona court order was by stipulation. There is nothing in it to suggest a hearing to consider Christeen's best interest, or indeed a hearing of any kind. The UCCJA has no provision in it authorizing jurisdiction simply by presence or consent of the adult contestants. See: In re Marriage of Hopson, infra. We cannot believe the Arizona court would ever have assumed jurisdiction had it been apprised of the jurisdictional impediments revealed in this record. In all likelihood it would have declined jurisdiction under Miss. Code Ann. §§ 93-23-5 and 93-23-13. The definition of "home state" under § 93-23-3(f) is identical with T28 § 1738A(b)(4), Footnote 9, supra. Section 93-23-5 makes "home state" a pre-requisite to assuming jurisdiction, absent unusual circumstances not present in this case. It is extremely doubtful that a criminal kidnapping could ever afford the basis for establishment of "home state" status in Arizona. See: Freeman v. Freeman, infra, discussed. Section 93-23-13 contains additional impediments to Arizona assumption of jurisdiction, but we see no need to carry the matter further.

Furthermore, aside from § 93-23-5 and § 93-23-13, the Arizona Court was prohibited from proceeding with this case under T28 § 1738A(g), or Miss. Code Ann. § 93-23-11(1), and as we have noted, under Miss. Code Ann. § 93-23-15.